# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## RALPH E. McCONKEY AND CARROLL L. HEWITT
## v. CITY OF FREDERICKSBURG.

April 13, 1942.

Record No. 2551.

Present, All the Justices.

The opinion states the case.

*Harry H. Sager, Joseph F. Rutherford* and *Hayden C. Covington*, for the plaintiffs in error.

*W. B. F. Cole*, for the defendant in error.

Holt, J., delivered the opinion of the court.

Ralph E. McConkey and Carroll L. Hewitt, unlicensed, sold pamphlets on the streets of Fredericksburg. The ordinance invoked reads:

"98. On each and every person selling or offering to sell song books or pamphlets on the streets of this City, there shall be a license tax of $0.93 per day or part thereof. Not prorated."

They are members of a religious organization or denomination known as "Jehovah's Witnesses" and are ordained ministers. Pamphlets sold are the "Watchtower" and "Consolation". They are official organs of that denomination and set out its tenets. The price was five cents a copy.

We brush aside all question of religious liberty. Plainly Jehovah's Witnesses can preach the gospel as they see it and may support their missionary endeavors by propaganda pamphlets. They might, in the same manner and with equal immunity, through like instrumentalities, support the Arian Heresy.

The ordinance under review calls for a license tax

of 93c a day, or an annual tax of $339.45. The gross proceeds from the sale of 6,750 pamphlets would not pay this license tax; so there is force in the argument that this levy is a prohibition and not a license tax at all. In receipts from sales defendants have no moneyed interest. Gross proceeds go to the home office and, in part, defray expenses of publication.

No effort has been made to collect a sales tax from any other publication which might fall within the letter of the ordinance, whether its purpose be spiritual or temporal. The Salvation Army's "War Cry" and the "Saturday Evening Post" are alike sold or distributed without let or hindrance. It is true that there is no direct evidence on this subject in the record, but counsel for the City of Fredericksburg, who is also attorney for the Commonwealth, conceded in argument that he knew of no such effort. In short, this ordinance has been held to apply to the "Watchtower" and "Consolation" and to no other publication of like character.

Construction long placed upon statutes without protest by officials charged with their enforcement is entitled to great weight, and so measured there is no valid excuse for their discrimination. *Smith* v. *Bryan*, 100 Va. 199, 40 S. E. 652; *South East Public Service Corporation of Virginia* v. *Commonwealth*, 165 Va. 116, 181 S. E. 448; *Commonwealth* v. *Sanderson*, 170 Va. 33, 195 S. E. 516; *Commonwealth* v. *Dodson*, 176 Va. 281, 11 S. E. (2d) 120.

The probable explanation of this discrimination is that some one, not unfriendly to the Salvation Army, is no friend to Jehovah's Witnesses.

These pamphlets are not in themselves objectionable. They are not indecent; they are not libelous; they are not likely to incite violence; they do not litter the streets, and their sale does not intend to impede traffic. The situation in Fredericksburg is quite different from that at Chicago in the "loop", such as was dealt with in *Chicago* v. *Rhine*, 363 Ill. 619, 2 N. E. (2d) 905, 105 A. L. R. 1045.

The character of the business itself is ordinarily indicative of the necessity for regulation. Plainly one can not, without permit, establish a bookstore on a street corner, even if only

one publication were sold; such, for example, as the Encyclo-
paedia Britannica. That would be a nuisance in itself and
would to some degree at least obstruct traffic.

"* * * Restrictions properly applicable to hawkers and
peddlers selling ordinary articles of merchandise on the streets
might not be appropriate to regulate sale and distribution of
literature of the sort offered for sale by the plaintiffs." *Han-
nan* v. *Haverhill*, 120 F. (2d) 87.

There this statute in vain was invoked as applicable to
the "Watchtower" and "Consolation":

"No persons except newsboys selling newspapers shall
stand in any street or way for the purpose of selling any
article, or for the exercise of any business or calling unless
otherwise provided by law, ordinance or special permit."

In *Lovell* v. *Griffin*, 303 U. S. 444, 58 S. Ct. 666, 82 L. Ed.
949, the Supreme Court was called upon to construe this
statute:

"Section 1. That the practice of distributing, either by
hand or otherwise, circulars, handbooks, advertising, or litera-
ture of any kind, whether said articles are being delivered
free, or whether same are being sold, within the limits of the
City of Griffin, without first obtaining written permission
from the City Manager of the City of Griffin, such practice
shall be deemed a nuisance, and punishable as an offense
against the City of Griffin.

"Section 2. The Chief of Police of the City of Griffin and
the police force of the City of Griffin are hereby required and
directed to suppress the same and to abate any nuisance as
is described in the first section of this ordinance."

This statute was held to be invalid on its face, and invalid,
not because arbitrary discretion was vested in the Chief of
Police, but because it struck at the freedom of the press by
subjecting it to license and censorship. Chief Justice Hughes,
in the course of his opinion, said:

"We think that the ordinance is invalid on its face. What-
ever the motive which induced its adoption, its character is
such that it strikes at the very foundation of the fredom of
the press by subjecting it to license and censorship. The

struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing.' And the liberty of the press became initially a right to publish *without* a license what formerly could be published only with one.' While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the constitutional provision. * * * (citing many cases). Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form."

In that case the Chief Justice took occasion to tell us why the ordinance in *Grosjean* v. *American Press Co.*, 297 U. S. 233, 56 S. Ct. 444, 80 L. Ed. 660, was held invalid. He said:

"The license tax in *Grosjean* v. *American Press Co.*, *supra*, was held invalid because of its direct tendency to restrict circulation."

And that, "The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets."

This right, guaranteed by the Fourteenth Amendment, cannot be invaded by a State.

In *Schneider* v. *New Jersey*, 308 U. S. 147, 60 S. Ct. 146, 84 L. Ed. 155, Jehovah's Witnesses again came into court.

An ordinance for the town of Irvington, New Jersey, provided that:

"No person except as in this ordinance provided shall canvass, solicit, distribute circulars, or other matter, or call from house to house in the Town of Irvington without first having reported to and received a written permit from the Chief of Police or the officer in charge of Police Headquarters."

Again, the court did not base its decision upon the fact that arbitrary power was vested in the Chief of Police but said that "to require a censorship through license which makes impossible the free and unhampered distribution of pamphlets strikes at the very heart of constitutional guarantees."

In conclusion it said:

"We do hold, however, that the ordinance in question, as applied to the petitioner's conduct, is void, and she cannot be punished for acting without a permit."

A late case dealing with this subject is *Vermont* v. *Greaves*, 112 Vt. 222, 22 A. (2d) 497. Jehovah's Witnesses were charged with conducting the business of "peddler" without first having obtained a license therefor from the City of Rutland. Its ordinance was:

"No person shall carry on the business of * * * peddler * * * * within the City, * * * without first obtaining a license therefor, as provided in this chapter, * * *."

The unlicensed sale of these pamphlets was upheld.

The Supreme Court of Illinois, in an opinion of date March 17, 1942, had occasion to pass upon a city ordinance, in all its essentials like that under review in the instant case, and held it too invalid. *Kazul* v. *Blue Island*, —— Ill. ——.

This entire subject is dealt with in a comprehensive note attached to *South Holland* v. *Stein*, 373 Ill. 472, 26 N. E. (2d) 868, 127 A. L. R. 957. Many cases are reviewed in support of the proposition that the unimpeded right to sell pamphlets should be upheld, citing *Lovell* v. *Griffin, supra*, in which conclusion the decisions in five States—California, Georgia, Massachusetts, New Jersey and Wisconsin—are reversed.

Certainly a license tax of over $300 a year would curtail the circulation of the "Watchtower" and "Consolation". It would do more than curtail it; it would suppress it.

Appellees rely upon *Norfolk* v. *Norfolk Landmark Pub. Co.*, 95 Va. 564, 28 S. E. 959. It was there contended that a tax upon the business of publishing a newspaper is one upon the freedom of the press. Plainly it was not. One might as well contend that a tax upon lawyers is a tax upon freedom of speech.

The prosecution appealed from should be dismissed, and it is so ordered.

*Reversed.*