# MURDOCK v. PENNSYLVANIA (CITY OF JEANNETTE).*

No. 480.   Argued March 10, 11, 1943.—Decided May 3, 1943.

---

*Together with No. 481, *Perisich* v. *Pennsylvania* (*City of Jeannette*), No. 482, *Mowder* v. *Pennsylvania* (*City of Jeannette*), No. 483, *Seders* v. *Pennsylvania* (*City of Jeannette*), No. 484, *Lamborn* v. *Pennsylvania* (*City of Jeannette*), No. 485, *Maltezòs* v. *Pennsylvania* (*City of Jeannette*), No. 486, *Anastasia Tzanes* v. *Pennsylvania* (*City of Jeannette*), and No. 487, *Ellaine Tzanes* v. *Pennsylvania* (*City of Jeannette*), also on writs of certiorari, 318 U. S. 748, to the Superior Court of Pennsylvania.

*Mr. Hayden C. Covington* for petitioners.

*Mr. Fred B. Trescher* for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The City of Jeannette, Pennsylvania, has an ordinance, some forty years old, which provides in part:

"That all persons canvassing for or soliciting within said Borough, orders for goods, paintings, pictures, wares, or merchandise of any kind, or persons delivering such articles under orders so obtained or solicited, shall be required to procure from the Burgess a license to transact said business and shall pay to the Treasurer of said Borough therefore the following sums according to the time for which said license shall be granted.

"For one day $1.50, for one week seven dollars ($7.00), for two weeks twelve dollars ($12.00), for three weeks twenty dollars ($20.00), provided that the provisions of this ordinance shall not apply to persons selling by sample to manufacturers or licensed merchants or dealers doing business in said Borough of Jeannette."

Petitioners are "Jehovah's Witnesses." They went about from door to door in the City of Jeannette distributing literature and soliciting people to "purchase" certain religious books and pamphlets, all published by the

Watch Tower Bible & Tract Society.[1] The "price" of the books was twenty-five cents each, the "price" of the pamphlets five cents each.[2] In connection with these activities, petitioners used a phonograph [3] on which they played a record expounding certain of their views on religion. None of them obtained a license under the ordinance. Before they were arrested each had made "sales" of books. There was evidence that it was their practice in making these solicitations to request a "contribution" of twenty-five cents each for the books and five cents each for the pamphlets, but to accept lesser sums or even to donate the volumes in case an interested person was without funds. In the present case, some donations of pamphlets were made when books were purchased. Petitioners were convicted and fined for violation of the ordinance. Their judgments of conviction were sustained by the Superior Court of Pennsylvania, 149 Pa. Super. Ct. 175, 27 A. 2d 666, against their contention that the ordinance deprived them of the freedom of speech, press, and religion guaranteed by the First Amendment. Petitions for leave to appeal to the Supreme Court of Pennsylvania were denied. The cases are here on petitions for writs of certiorari which we granted along with the petitions for rehearing of *Jones v. Opelika*, 316 U. S. 584, and its companion cases.

---

[1] Two religious books—Salvation and Creation—were sold. Others were offered in addition to the Bible. The Watch Tower Bible & Tract Society is alleged to be a non-profit charitable corporation.

[2] Petitioners paid three cents each for the pamphlets and, if they devoted only their spare time to the work, twenty cents each for the books. Those devoting full time to the work acquired the books for five cents each. There was evidence that some of the petitioners paid the difference between the sales price and the cost of the books to their local congregations which distributed the literature.

[3] Purchased along with the record from the Watch Tower Bible & Tract Society.

The First Amendment, which the Fourteenth makes applicable to the states, declares that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press . . ." It could hardly be denied that a tax laid specifically on the exercise of those freedoms would be unconstitutional. Yet the license tax imposed by this ordinance is, in substance, just that.

Petitioners spread their interpretations of the Bible and their religious beliefs largely through the hand distribution of literature by full or part time workers.[4] They claim to follow the example of Paul, teaching "publickly, and from house to house." Acts 20:20. They take literally the mandate of the Scriptures, "Go ye into all the world, and preach the gospel to every creature." Mark 16:15. In doing so they believe that they are obeying a commandment of God.

The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses.[5] It has been a potent force in various religious movements down through the years.[6] This form of evangelism is utilized today on a large scale by various religious sects whose colporteurs carry the Gospel to thou-

---

[4] The nature and extent of their activities throughout the world during the years 1939 and 1940 are to be found in the 1941 Yearbook of Jehovah's Witnesses, pp. 62–243.

[5] Palmer, The Printing Press and the Gospel (1912).

[6] White, The Colporteur Evangelist (1930); Home Evangelization (1850); Edwards, The Romance of the Book (1932) c. V; 12 Biblical Repository (1844) Art. VIII; 16 The Sunday Magazine (1887) pp. 43–47; 3 Meliora (1861) pp. 311–319; Felice, Protestants of France (1853) pp. 53, 513; 3 D'Aubigne, History of The Reformation (1849) pp. 103, 152, 436–437; Report of Colportage in Virginia, North Carolina & South Carolina, American Tract Society (1855). An early type of colporteur was depicted by John Greenleaf Whittier in his legendary poem, The Vaudois Teacher. And see, Wylie, History of the Waldenses.

sands upon thousands of homes and seek through personal visitations to win adherents to their faith.[7] It is more than preaching; it is more than distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits. It has the same claim to protection as the more orthodox and conventional exercises of religion. It also has the same claim as the others to the guarantees of freedom of speech and freedom of the press.

The integrity of this conduct or behavior as a religious practice has not been challenged. Nor do we have presented any question as to the sincerity of petitioners in their religious beliefs and practices, however misguided they may be thought to be. Moreover, we do not intimate or suggest in respecting their sincerity that any conduct can be made a religious rite and by the zeal of the practitioners swept into the First Amendment. *Reynolds* v.

[7] The General Conference of Seventh-Day Adventists, who filed a brief *amicus curiae* on the reargument of *Jones* v. *Opelika,* has given us the following data concerning their literature ministry: This denomination has 83 publishing houses throughout the world, issuing publications in over 200 languages. Some 9,256 separate publications were issued in 1941. By printed and spoken word, the Gospel is carried into 412 countries in 824 languages. 1942 Yearbook, p. 287. During December 1941, a total of 1,018 colporteurs operated in North America. They delivered during that month $97,997.19 worth of gospel literature, and for the whole year of 1941 a total of $790,610.36—an average per person of about $65 per month. Some of these were students and temporary workers. Colporteurs of this denomination receive half of their collections, from which they must pay their traveling and living expenses. Colporteurs are specially trained and their qualifications equal those of preachers. In the field, each worker is under the supervision of a field missionary secretary to whom a weekly report is made. After fifteen years of continuous service, each colporteur is entitled to the same pension as retired ministers. And see Howell, The Great Advent Movement (1935), pp. 72–75.

*United States,* 98 U. S. 145, 161–167, and *Davis* v. *Beason,* 133 U. S. 333 denied any such claim to the practice of polygamy and bigamy. Other claims may well arise which deserve the same fate. We only hold that spreading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types. The manner in which it is practiced at times gives rise to special problems with which the police power of the states is competent to deal. See for example *Cox* v. *New Hampshire,* 312 U. S. 569, and *Chaplinsky* v. *New Hampshire,* 315 U. S. 568. But that merely illustrates that the rights with which we are dealing are not absolutes. *Schneider* v. *State,* 308 U. S. 147, 160–161. We are concerned, however, in these cases merely with one narrow issue. There is presented for decision no question whatsoever concerning punishment for any alleged unlawful acts during the solicitation. Nor is there involved here any question as to the validity of a registration system for colporteurs and other solicitors. The cases present a single issue—the constitutionality of an ordinance which as construed and applied requires religious colporteurs to pay a license tax as a condition to the pursuit of their activities.

The alleged justification for the exaction of this license tax is the fact that the religious literature is distributed with a solicitation of funds. Thus it was stated, in *Jones* v. *Opelika, supra,* p. 597, that when a religious sect uses "ordinary commercial methods of sales of articles to raise propaganda funds," it is proper for the state to charge "reasonable fees for the privilege of canvassing." Situations will arise where it will be difficult to determine whether a particular activity is religious or purely commercial. The distinction at times is vital. As we stated only the other day, in *Jamison* v. *Texas,* 318 U. S. 413, 417, "The states can prohibit the use of the streets for

the distribution of purely commercial leaflets, even though such leaflets may have 'a civic appeal, or a moral platitude' appended. *Valentine* v. *Chrestensen*, 316 U. S. 52, 55. They may not prohibit the distribution of handbills in the pursuit of a clearly religious activity merely because the handbills invite the purchase of books for the improved understanding of the religion or because the handbills seek in a lawful fashion to promote the raising of funds for religious purposes." But the mere fact that the religious literature is "sold" by itinerant preachers rather than "donated" does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. The right to use the press for expressing one's views is not to be measured by the protection afforded commercial handbills. It should be remembered that the pamphlets of Thomas Paine were not distributed free of charge. It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist, however misguided or intolerant he may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him. Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way. As we have said, the problem of drawing the line between a purely commercial activity and a religious one will at times be difficult. On this record it plainly cannot be said that petitioners were engaged in a commercial rather than a religious venture. It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. And the Pennsylvania court did not rest the judgments of conviction on that basis, though it did find

that petitioners "sold" the literature. The Supreme Court of Iowa in *State* v. *Mead,* 230 Iowa 1217, 300 N. W. 523, 524, described the selling activities of members of this same sect as "merely incidental and collateral" to their "main object which was to preach and publicize the doctrines of their order." And see *State* v. *Meredith,* 197 S. C. 351, 15 S. E. 2d 678; *People* v. *Barber,* 289 N. Y. 378, 385–386, 46 N. E. 2d 329. That accurately summarizes the present record.

We do not mean to say that religious groups and the press are free from all financial burdens of government. See *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250. We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon. The tax imposed by the City of Jeannette is a flat license tax, the payment of which is a condition of the exercise of these constitutional privileges. The power to tax the exercise of a privilege is the power to control or suppress its enjoyment. *Magnano Co.* v. *Hamilton,* 292 U. S. 40, 44–45, and cases cited. Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance. Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse. Spreading religious beliefs in this ancient and honorable manner would thus be denied the needy. Those who can deprive religious groups of their colporteurs can take from them a part of the vital power of the press which has survived from the Reformation.

It is contended, however, that the fact that the license tax can suppress or control this activity is unim-

portant if it does not do so. But that is to disregard the nature of this tax. It is a license tax—a flat tax imposed on the exercise of a privilege granted by the Bill of Rights. A state may not impose a charge for the enjoyment of a right granted by the Federal Constitution. Thus, it may not exact a license tax for the privilege of carrying on interstate commerce (*McGoldrick* v. *Berwind-White Co.,* 309 U. S. 33, 56–58), although it may tax the property used in, or the income derived from, that commerce, so long as those taxes are not discriminatory. *Id.,* p. 47 and cases cited. A license tax applied to activities guaranteed by the First Amendment would have the same destructive effect. It is true that the First Amendment, like the commerce clause, draws no distinction between license taxes, fixed sum taxes, and other kinds of taxes. But that is no reason why we should shut our eyes to the nature of the tax and its destructive influence. The power to impose a license tax on the exercise of these freedoms is indeed as potent as the power of censorship which this Court has repeatedly struck down. *Lovell* v. *Griffin,* 303 U. S. 444; *Schneider* v. *State, supra; Cantwell* v. *Connecticut,* 310 U. S. 296, 306; *Largent* v. *Texas,* 318 U. S. 418; *Jamison* v. *Texas, supra.* It was for that reason that the dissenting opinions in *Jones* v. *Opelika, supra,* stressed the nature of this type of tax. 316 U. S. pp. 607–609, 620, 623. In that case, as in the present ones, we have something very different from a registration system under which those going from house to house are required to give their names, addresses and other marks of identification to the authorities. In all of these cases the issuance of the permit or license is dependent on the payment of a license tax. And the license tax is fixed in amount and unrelated to the scope of the activities of petitioners or to their realized revenues. It is not a nominal fee

imposed as a regulatory measure to defray the expenses of policing the activities in question.[8]  It is in no way apportioned.  It is a flat license tax levied and collected as a condition to the pursuit of activities whose enjoyment is guaranteed by the First Amendment.  Accordingly, it restrains in advance those constitutional liberties of press and religion and inevitably tends to suppress their exercise.  That is almost uniformly recognized as the inherent vice and evil of this flat license tax.  As stated by the Supreme Court of Illinois in a case involving this same sect and an ordinance similar to the present one, a person cannot be compelled "to purchase, through a license fee or a license tax, the privilege freely granted by the constitution." [9]  *Blue Island* v. *Kozul,* 379 Ill. 511, 519, 41 N. E. 2d 515.  So, it may not be said that proof is lacking that these license taxes either separately or cumulatively have restricted or are likely to restrict petitioners' religious activities.  On their face they are a restriction of the free exercise of those freedoms which are protected by the First Amendment.

The taxes imposed by this ordinance can hardly help but be as severe and telling in their impact on the freedom

---

[8] The constitutional difference between such a regulatory measure and a tax on the exercise of a federal right has long been recognized. While a state may not exact a license tax for the privilege of carrying on interstate commerce (*McGoldrick* v. *Berwind-White Co.,* supra, pp. 56–58), it may, for example, exact a fee to defray the cost of purely local regulations in spite of the fact that those regulations incidentally affect commerce. "So long. as they do not impede the free flow of commerce and are not made the subject of regulation by Congress they are not forbidden. *Clyde Mallory Lines* v. *Alabama,* 296 U. S. 261, 267, and cases cited.  And see *South Carolina Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177, 185–188.

[9] That is the view of most state courts which have passed on the question. *McConkey* v. *Fredericksburg,* 179 Va. 556, 19 S. E. 2d 682; *State* v. *Greaves,* 112 Vt. 222, 22 A. 2d 497; *People* v. *Banks,* 168 Misc. 515, 6 N. Y.,S. 2d 41.  *Contra: Cook* v. *Harrison,* 180 Ark. 546, 21 S. W. 2d 966.

of the press and religion as the "taxes on knowledge" at which the First Amendment was partly aimed. *Grosjean* v. *American Press Co., supra,* pp. 244–249. They may indeed operate even more subtly. ' Itinerant evangelists moving throughout a state or from state to state would feel immediately the cumulative effect of such ordinances as they become fashionable. The way of the religious dissenter has long been hard. But if the formula of this type of ordinance is approved, a new device for the suppression of religious minorities will have been found. This method of disseminating religious beliefs can be crushed and closed out by the sheer weight of the toll or tribute which is exacted town by town, village by village. The spread of religious ideas through personal visitations by the literature ministry of numerous religious groups would be stopped.

The fact that the ordinance is "nondiscriminatory" is immaterial. The protection afforded by the First Amendment is not so restricted. A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of press, freedom of speech, freedom of religion are in a preferred position.

It is claimed, however, that the ultimate question in determining the constitutionality of this license tax is whether the state has given something for which it can ask a return. That principle has wide applicability. *State Tax Commission* v. *Aldrich,* 316 U. S. 174, and cases cited. But it is quite irrelevant here. This tax is not a charge for the enjoyment of a privilege or benefit bestowed by the state. The privilege in question exists apart from state authority. It is guaranteed the people by the Federal Constitution.

Considerable emphasis is placed on the kind of literature which petitioners were distributing—its provocative,

abusive, and ill-mannered character and the assault which it makes on our established churches and the cherished faiths of many of us. See *Douglas* v. *Jeannette,* concurring opinion, *post,* p. 166. But those considerations are no justification for the license tax which the ordinance imposes. Plainly a community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful. If that device were ever sanctioned, there would have been forged a ready instrument for the suppression of the faith which any minority cherishes but which does not happen to be in favor. That would be a complete repudiation of the philosophy of the Bill of Rights.

Jehovah's Witnesses are not "above the law." But the present ordinance is not directed to the problems with which the police power of the state is free to deal. It does not cover, and petitioners are not charged with, breaches of the peace. They are pursuing their solicitations peacefully and quietly. Petitioners, moreover, are not charged with or prosecuted for the use of language which is obscene, abusive, or which incites retaliation. Cf. *Chaplinsky* v. *New Hampshire, supra.* Nor do we have here, as we did in *Cox* v. *New Hampshire, supra,* and *Chaplinsky* v. *New Hampshire, supra,* state regulation of the streets to protect and insure the safety, comfort, or convenience of the public. Furthermore, the present ordinance is not narrowly drawn to safeguard the people of the community in their homes against the evils of solicitations. See *Cantwell* v. *Connecticut, supra,* 306. As we have said, it is not merely a registration ordinance calling for an identification of the solicitors so as to give the authorities some basis for investigating strangers coming into the community. And the fee is not a nominal one, imposed as a regulatory measure and calculated to defray the expense of protecting those on the streets and at home against the abuses of solicitors. See *Cox* v. *New Hamp-*

*shire, supra,* pp. 576–577. Nor can the present ordinance survive if we assume that it has been construed to apply only to solicitation from house to house.[10] The ordinance is not narrowly drawn to prevent or control abuses or evils arising from that activity. Rather, it sets aside the residential areas as a prohibited zone, entry of which is denied petitioners unless the tax is paid. That restraint and one which is city-wide in scope (*Jones* v. *Opelika*) are different only in degree. Each is an abridgment of freedom of press and a restraint on the free exercise of religion. They stand or fall together.

The judgment in *Jones* v. *Opelika* has this day been vacated. Freed from that controlling precedent, we can restore to their high, constitutional position the liberties of itinerant evangelists who disseminate their religious beliefs and the tenets of their faith through distribution of literature. The judgments are reversed and the causes are remanded to the Pennsylvania Superior Court for proceedings not inconsistent with this opinion.

*Reversed.*

The following dissenting opinions are applicable to Nos. 280, 314, and 966 (October Term, 1941), *Jones* v. *Opelika, ante,* p. 103; and to Nos. 480–487, *Murdock* v. *Pennsylvania, ante,* p. 105. See also opinion of MR. JUSTICE JACKSON, *post,* p. 166.

MR. JUSTICE REED, dissenting:

These cases present for solution the problem of the constitutionality of certain municipal ordinances levying a tax for the production of revenue on the sale of books

---

[10] The Pennsylvania Superior Court stated that the ordinance has been "enforced" only to prevent petitioners from canvassing "from door to door and house to house" without a license and not to prevent them from distributing their literature on the streets. 149 Pa. Super. Ct., p. 184, 27 A. 2d 670.

and pamphlets in the streets or from door to door. Decisions sustaining the particular ordinances were entered in the three cases first listed at the last term of this Court. In that opinion the ordinances were set out and the facts and issues stated. *Jones* v. *Opelika,* 316 U. S. 584. A rehearing has been granted. The present judgments vacate the old and invalidate the ordinances. The eight cases of this term involve canvassing from door to door only under similar ordinances, which are in the form stated in the Court's opinion. By a *per curiam* opinion of this day, the Court affirms its acceptance of the arguments presented by the dissent of last term in *Jones* v. *Opelika.* The Court states its position anew in the *Jeannette* cases.

This dissent does not deal with an objection which theoretically could be made in each case, to wit, that the licenses are so excessive in amount as to be prohibitory. This matter is not considered because that defense is not relied upon in the pleadings, the briefs or at the bar. No evidence is offered to show the amount is oppressive. An unequal tax, levied on the activities of distributors of informatory publications, would be a phase of discrimination against the freedom of speech, press or religion. Nor do we deal with discrimination against the petitioners, as individuals or as members of the group, calling themselves Jehovah's Witnesses. There is no contention in any of these cases that such discrimination is practiced in the application of the ordinances. Obviously, an improper application by a city, which resulted in the arrest of Witnesses and failure to enforce the ordinance against other groups, such as the Adventists, would raise entirely distinct issues.

A further and important disclaimer must be made in order to focus attention sharply upon the constitutional issue. This dissent does not express, directly or by inference, any conclusion as to the constitutional rights of state or federal governments to place a privilege tax upon the

soliciting of a free-will contribution for religious purposes. Petitioners suggest that their books and pamphlets are not sold but are given either without price or in appreciation of the recipient's gift for the furtherance of the work of the Witnesses. The pittance sought, as well as the practice of leaving books with poor people without cost, gives strength to this argument. In our judgment, however, the plan of national distribution by the Watch Tower Bible & Tract Society, with its wholesale prices of five or twenty cents per copy for books, delivered to the public by the Witnesses at twenty-five cents per copy, justifies the characterization of the transaction as a sale by all the state courts. The evidence is conclusive that the Witnesses normally approach a prospect with an offer of a book for twenty-five cents. Sometimes, apparently rarely, a book is left with a prospect without payment. The *quid pro quo* is demanded. If the profit was greater, twenty cents or even one dollar, no difference in principle would emerge. The Witness sells books to raise money for propagandizing his faith, just as other religious groups might sponsor bazaars, or peddle tickets to church suppers, or sell Bibles or prayer books for the same object. However high the purpose or noble the aims of the Witness, the transaction has been found by the state courts to be a sale under their ordinances and, though our doubt was greater than it is, the state's conclusion would influence us to follow its determination.[1]

---

[1] The Court in the *Murdock* case analyzes the contention that the sales technique partakes of commercialism and says: "It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. And the Pennsylvania court did not rest the judgments of conviction on that basis, though it did find that petitioners 'sold' the literature." The state court, in its opinion, 149 Pa. Super. Ct. 175, 27 A. 2d 666, 667, stated the applicable ordinance as forbidding sales of merchandise by canvassing without a license, and said that the evidence established its violation by selling "two books entitled 'Salvation' and 'Creation' respectively, and certain

In the opinion in *Jones* v. *Opelika*, 316 U. S. 584, on the former hearing, attention was called to the differentiation between these cases of taxation and those of forbidden censorship, prohibition or discrimination. There is no occasion to repeat what has been written so recently as to the constitutional right to tax the money-raising activities of religious or didactic groups. There are, however, other reasons, not fully developed in that opinion, that add to our conviction that the Constitution does not prohibit these general occupational taxes.

The real contention of the Witnesses is that there can be no taxation of the occupation of selling books and pamphlets because to do so would be contrary to the due process clause of the Fourteenth Amendment, which now is held to have drawn the contents of the First Amendment into the category of individual rights protected

---

leaflets or pamphlets, all published by the Watch Tower Bible and Tract Society of Brooklyn, N. Y., for which the society fixed twenty-five cents each as the price for the books and five cents each as the price of the leaflets. Defendants paid twenty cents each for the books, unless they devoted their whole time to the work, in which case they paid five cents each for the books they sold at twenty-five cents. Some of the witnesses spoke of 'contributions' but the evidence justified a finding that they *sold* the books and pamphlets."

The state court then repeated with approval from one of its former decisions the statements: "The constitutional right of freedom of worship does not guarantee anybody the right to *sell* anything from house to house or in buildings, belonging to, or in the occupancy of, other persons." ". . . we do not accede to his contention on the oral argument that the federal decisions relied upon by him go so far as to rule that the constitutional guaranty of a free press forbids dealers in books and printed matter being subjected to our State mercantile license tax or the federal income tax as to such sales, along with dealers in other merchandise." *Pittsburgh* v. *Ruffner*, 134 Pa. Super. Ct. 192, 199, 202, 4 A. 2d 224. And after further discussion of selling, the conviction of the Witnesses was affirmed. It can hardly be said, we think, that the state court did not treat the Jeannette canvassers as engaged in a commercial activity or occupation at the time of their arrests.

from state deprivation. *Gitlow* v. *New York*, 268 U. S. 652, 666; *Near* v. *Minnesota*, 283 U. S. 697, 707; *Cantwell* v. *Connecticut*, 310 U. S. 296, 303. Since the publications teach a religion which conforms to our standards of legality, it is urged that these ordinances prohibit the free exercise of religion and abridge the freedom of speech and of the press.

The First Amendment reads as follows:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

It was one of twelve proposed on September 25, 1789, to the States by the First Congress after the adoption of the Constitution. Ten were ratified. They were intended to be and have become our Bill of Rights. By their terms, our people have a guarantee that so long as law as we know it shall prevail, they shall live protected from the tyranny of the despot or the mob. None of the provisions of our Constitution is more venerated by the people or respected by legislatures and the courts than those which proclaim for our country the freedom of religion and expression. While the interpreters of the Constitution find the purpose was to allow the widest practical scope for the exercise of religion and the dissemination of information, no jurist has ever conceived that the prohibition of interference is absolute.[2] Is subjection to nondiscriminatory, nonexcessive taxation in the distribution of religious literature, a prohibition of the exercise of religion or an abridgment of the freedom of the press?

---

[2] *Whitney* v. *California*, 274 U. S. 357, 371, and the concurring opinion, 373; *Reynolds* v. *United States*, 98 U. S. 145, 166; *Cantwell* v. *Connecticut*, 310 U. S. 296, 303; *Cox* v. *New Hampshire*, 312 U. S. 569, 574, 576.

Nothing has been brought to our attention which would lead to the conclusion that the contemporary advocates of the adoption of a Bill of Rights intended such an exemption. The words of the Amendment do not support such a construction. "Free" cannot be held to be without cost but rather its meaning must accord with the freedom guaranteed. "Free" means a privilege to print or pray without permission and without accounting to authority for one's actions. In the Constitutional Convention the proposal for a Bill of Rights of any kind received scant attention.[3] In the course of the ratification of the Constitution, however, the absence of a Bill of Rights was used vigorously by the opponents of the new government. A number of the states suggested amendments. Where these suggestions have any bearing at all upon religion or free speech, they indicate nothing as to any feeling concerning taxation either of religious bodies or their evangelism.[4] This was not because freedom of

[3] Journal of the Convention, 369; II Farrand, The Records of the Federal Convention, 611, 616-8, 620. Cf. McMaster & Stone, Pennsylvania and the Federal Constitution, 251-3.

[4] I Elliot's Debates on the Federal Constitution (1876) 319 et seq. In ratifying the Constitution the following declarations were made: *New Hampshire*, p. 326, "XI. Congress shall make no laws touching religion, or to infringe the rights of conscience." *Virginia*, p. 327, ". . . no right, of any denomination, can be cancelled, abridged, restrained, or modified, by the Congress, by the Senate or House of Representatives, acting in any capacity, by the President, or any department or officer of the United States, except in those instances in which power is given by the Constitution for those purposes; and that, among other essential rights, the liberty of conscience, and of the press, cannot be cancelled, abridged, restrained, or modified, by any authority of the United States." *New York*, p. 328, "That the freedom of the press ought not to be violated or restrained." After the submission of the amendments, *Rhode Island* ratified and declared, pp. 334, 335, "IV. That religion, or the duty which we owe to our Creator, and the manner of discharging it, can be directed only by reason and conviction, and not by force and violence; and therefore all men have a natural, equal, and unalienable right to the

religion or free speech was not understood. It was because the subjects were looked upon from standpoints entirely distinct from taxation.[5]

The available evidence of Congressional action shows clearly that the draftsmen of the amendments had in mind the practice of religion and the right to be heard, rather than any abridgment or interference with either by taxa-

exercise of religion according to the dictates of conscience; and that no particular religious sect or society ought to be favored or established, by law, in preference to others. . . . XVI. That the people have a right to freedom of speech, and of writing and publishing their sentiments. That freedom of the press is one of the greatest bulwarks of liberty, and ought not to be violated."

[5] The Articles of Confederation had references to religion and free speech:

"Article III. The said States hereby severally enter into a firm league of friendship with each other, for their common defence, the security of their liberties, and their mutual and general welfare, binding themselves to assist each other, against all force offered to, or attacks made upon them, or any of them, on account of religion, sovereignty, trade, or any other pretence whatever."

"Article V. . . . Freedom of speech and debate in Congress shall not be impeached or questioned in any court, or place out of Congress, and the members of Congress shall be protected in their persons from arrests and imprisonments, during the time of their going to and from, and attendance on Congress, except for treason, felony, or breach of the peace."

The Statute of Religious Freedom was passed in Virginia in 1785. The substance was in paragraph II: *"Be it enacted by the General Assembly,* That no man shall be compelled to frequent or support any religious worship, place, or ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief; but that all men shall be free to profess, and by argument to maintain, their opinion in matters of religion, and that the same shall in no wise diminish, enlarge, or affect their civil capacities." 12 Hening Statutes of Va. 86.

A number of the states' constitutions at the time of the adoption of the Bill of Rights contained provisions as to a free press:

Georgia, Constitution of 1777, Art. LXI. "Freedom of the press

tion in any form.[6]   The amendments were proposed by

and trial by jury to remain inviolate forever."   I Poore, Federal and State Constitutions 383.

Maryland, Constitution of 1776, Declaration of Rights, Art. XXXVIII.   "That the liberty of the press ought to be inviolably preserved."   *Id.* 820.

Massachusetts, Constitution of 1780, Part First, Art. XVI.   "The liberty of the press is essential to the security of freedom in a State; it ought not, therefore, to be restrained in this commonwealth."   *Id.,* 959.

New Hampshire, Constitution of 1784, Part 1, Art. XXII.   "The Liberty of the Press is essential to the security of freedom in a state; it ought, therefore, to be inviolably preserved."   II Poore, *id.,* 1282.

North Carolina, Constitution of 1776, Declaration of Rights, Art. XV.   "That the freedom of the press is one of the great bulwarks of liberty, and therefore ought never to be restrained."   *Id.,* 1410.

Pennsylvania, Constitution of 1776, Declaration of Rights, Art. XII. "That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained."   *Id.,* 1542.

Virginia, Bill of Rights, 1776, § 12.   "That the freedom of the press is one of the great bulwarks of liberty, and can never be restrained but by despotic governments."   *Id.,* 1909.

   [6] For example, the first amendment as it passed the House of Representatives on Monday, August 24, 1789, read as follows:

"Congress shall make no law establishing religion or prohibiting the free exercise thereof, nor shall the rights of Conscience be infringed.

"The Freedom of Speech, and of the Press, and the right of the People peaceably to assemble, and consult for their common good, and to apply to the Government for a redress of grievances, shall not be infringed."   Records of the United States Senate, 1A–C2 (U. S. Nat. Archives).

Apparently when the proposed amendments were passed by the Senate on September 9, 1789, what is now the first amendment read as follows:

"Congress shall make no law establishing articles of faith, or a mode of worship, or prohibiting the free exercise of religion, or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition to the government for a redress of grievances." *Id.*

Mr. Madison. He was careful to explain to the Congress the meaning of the amendment on religion. The draft was commented upon by Mr. Madison when it read:

"no religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 Annals of Congress 729.

He said that he apprehended the meaning of the words on religion to be that Congress should not establish a religion and enforce the legal observation of it by law, nor compel men to worship God in any manner contrary to their conscience. *Id.*, 730. No such specific interpretation of the amendment on freedom of expression has been found in the debates. The clearest is probably from Mr. Benson,[7] who said that

"The committee who framed this report proceeded on the principle that these rights belonged to the people; they conceived them to be inherent; and all that they meant to provide against was their being infringed by the Government." *Id.*, 731–32.

There have been suggestions that the English taxes on newspapers, springing from the tax act of 10 Anne, c. 19, § CI,[8] influenced the adoption of the First Amendment.[9]

---

[7] Egbert Benson was the first attorney general of New York, a member of the Continental Congress and of the New York Convention for ratification of the Constitution. Biographical Directory of the American Congress, 694.

[8] "And be it enacted by the Authority aforesaid, That there shall be raised, levied, collected and paid, to and for the Use of her Majesty, her Heirs and Successors, for and upon all Books and Papers commonly called Pamphlets, and for and upon all News Papers, or Papers containing publick News, Intelligence or Occurrences, which shall, at any Time or Times within or during the Term last mentioned, be printed in *Great Britain*, to be dispersed and made publick, and for and upon such Advertisements as are herein after mentioned, the respective Duties following; that is to say,

These taxes were obnoxious but an examination of the sources of the suggestion is convincing that there is nothing to support it except the fact that the tax on newspapers was in existence in England and was disliked.[10] The simple answer is that, if there had been any purpose of Congress to prohibit any kind of taxes on the press, its knowledge of the abominated English taxes would have led it to ban them unequivocally.

It is only in recent years that the freedoms of the First Amendment have been recognized as among the fundamental personal rights protected by the Fourteenth Amendment from impairment by the states.[11] Until then these liberties were not deemed to be guarded from state action by the Federal Constitution.[12] The states placed

"For every such Pamphlet or Paper contained in Half a Sheet, or any lesser Piece of Paper, so printed, the Sum of one Half-penny Sterling.

"For every such Pamphlet or Paper (being larger than Half a Sheet, and not exceeding one whole Sheet) so printed, a Duty after the Rate of one Penny Sterling for every printed Copy thereof.

"And for every such Pamphlet or Paper, being larger than one whole Sheet, and not exceeding six Sheets in Octavo, or in a lesser Page, or not exceeding twelve Sheets in Quarto, or twenty Sheets in Folio, so printed, a Duty after the Rate of two Shillings Sterling for every Sheet of any kind of Paper which shall be contained in one printed Copy thereof.

"And for every Advertisement to be contained in the *London Gazette*, or any other printed Paper, such Paper being dispersed or made publick weekly, or oftner, the Sum of twelve Pence Sterling."

[9] Stevens, Sources of the Constitution, 221, note 2; Stewart, Lennox and the Taxes on Knowledge, 15 Scottish Hist. Rev. 322, 326; McMaster & Stone, Pennsylvania and the Federal Constitution, 181; *Grosjean* v. *American Press Co.*, 297 U. S. 233, 248.

[10] Cf. Collet, Taxes on Knowledge; Chafee, Free Speech in the United States, 17, n. 33.

[11] *Gitlow* v. *New York* (1925), 268 U. S. 652, 666; *Near* v. *Minnesota*, 283 U. S. 697, 707; *Cantwell* v. *Connecticut*, 310 U. S. 296, 307.

[12] *Permoli* v. *First Municipality*, 3 How. 589, 609; *Barron* v. *Baltimore*, 7 Pet. 243, 247.

restraints upon themselves in their own constitutions in order to protect their people in the exercise of the freedoms of speech and of religion.[13]  Pennsylvania may be taken as a fair example.  Its constitution reads:

"All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship." Purdon's Penna. Stat., Const., Art. I, § 3.

"No person who acknowledges the being of a God, and a future state of rewards and punishments shall, on account of his religious sentiments, be disqualified to hold any office or place of trust or profit under this Commonwealth." *Id.*, Art. I, § 4.

"The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof.  The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. . . ."  *Id.*, Art. I, § 7.

It will be observed that there is no suggestion of freedom from taxation, and this statement is equally true of the other state constitutional provisions.  It may be concluded that neither in the state or the federal constitutions was general taxation of church or press interdicted.

Is there anything in the decisions of this Court which indicates that church or press is free from the financial

---

[13] For the state provisions on expression and religion, see 2 Cooley. Constitutional Limitations (8th Ed.) 876, 965; III Constitutions of the States, New York State Const. Conv. Committee 1938.

burdens of government? We find nothing. Religious societies depend for their exemptions from taxation upon state constitutions or general statutes, not upon the Federal Constitution. *Gibbons* v. *District of Columbia,* 116 U. S. 404. This Court has held that the chief purpose of the free press guarantee was to prevent previous restraints upon publication. *Near* v. *Minnesota,* 283 U. S. 697, 713.[14] In *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250, it was said that the predominant purpose was to preserve "an untrammeled press as a vital source of public information." In that case, a gross receipts tax on advertisements in papers with a circulation of more than twenty thousand copies per week was held invalid because "a deliberate and calculated device in the guise of a tax to limit the circulation. . . ." There was this further comment:

"It is not intended by anything we have said to suggest that the owners of newspapers are immune from any of the ordinary forms of taxation for support of the government. But this is not an ordinary form of tax, but one single in kind, with a long history of hostile misuse against the freedom of the press." *Id.,* 250.

It may be said, however, that ours is a too narrow, technical and legalistic approach to the problem of state taxation of the activities of church and press; that we should look not to the expressed or historical meaning of the First Amendment but to the broad principles of free speech and free exercise of religion which pervade our national way of life. It may be that the Fourteenth Amendment guarantees these principles rather than the more definite concept expressed in the First Amendment. This would mean that as a Court, we should determine what sort of liberty it is that the due process clause of

---

[14] To this Professor Chafee adds the right to criticize the Government. Free Speech in the United States (1941) 18 *et seq.* Cf. 2 Cooley's Constitutional Limitations (8th Ed.) 886.

the Fourteenth Amendment guarantees against state restrictions on speech and church.

But whether we give content to the literal words of the First Amendment or to principles of the liberty of the press and the church, we conclude that cities or states may levy reasonable, non-discriminatory taxes on such activities as occurred in these cases. Whatever exemptions exist from taxation arise from the prevailing law of the various states. The constitutions of Alabama and Pennsylvania, with substantial similarity to the exemption provisions of other constitutions, forbid the taxation of lots and buildings used exclusively for religious worship. Alabama (1901), § 91; Pennsylvania (1874), Art. IX, § 1. These are the only exemptions of the press or church from taxation. We find nothing more applicable to our problem in the other constitutions. Surely this unanimity of specific state action on exemptions of religious bodies from taxes would not have occurred throughout our history, if it had been conceived that the genius of our institutions, as expressed in the First Amendment, was incompatible with the taxation of church or press.

Nor do we understand that the Court now maintains that the Federal Constitution frees press or religion of any tax except such occupational taxes as those here levied. Income taxes, ad valorem taxes, even occupational taxes are presumably valid, save only a license tax on sales of religious books. Can it be that the Constitution permits a tax on the printing presses and the gross income of a metropolitan newspaper [15] but denies the right to lay an occupational tax on the distributors of the same papers? Does the exemption apply to booksellers or distributors of magazines or only to religious publications? And, if the latter, to what distributors? Or to what books? Or is this Court saying that a religious

---

[15] *Giragi* v. *Moore*, 301 U. S. 670; 48 Ariz. 33; 49 Ariz. 74.

practice of book distribution is free from taxation because a state cannot prohibit the "free exercise thereof" and a newspaper is subject to the same tax even though the same Constitutional Amendment says the state cannot abridge the freedom of the press? It has never been thought before that freedom from taxation was a perquisite attaching to the privileges of the First Amendment. The National Government grants exemptions to ministers and churches because it wishes to do so, not because the Constitution compels. Internal Revenue Code, §§ 22 (b) (6), 101 (6), 812 (d), 1004 (a) (2) (B). Where camp meetings or revivals charge admissions, a federal tax would apply, if Congress had not granted freedom from the exaction. *Id.*, § 1701.

It is urged that such a tax as this may be used readily to restrict the dissemination of ideas. This must be conceded but the possibility of misuse does not make a tax unconstitutional. No abuse is claimed here. The ordinances in some of these cases are the general occupation license type covering many businesses. In the *Jeannette* prosecutions, the ordinance involved lays the usual tax on canvassing or soliciting sales of goods, wares and merchandise. It was passed in 1898. Every power of taxation or regulation is capable of abuse. Each one, to some extent, prohibits the free exercise of religion and abridges the freedom of the press, but that is hardly a reason for denying the power. If the tax is used oppressively, the law will protect the victims of such action.

This decision forces a tax subsidy notwithstanding our accepted belief in the separation of church and state. Instead of all bearing equally the burdens of government, this Court now fastens upon the communities the entire cost of policing the sales of religious literature. That the burden may be heavy is shown by the record in the *Jeannette* cases. There are only eight prosecutions, but one hundred and four Witnesses solicited in Jeannette the day

of the arrests. They had been requested by the authorities to await the outcome of a test case before continuing their canvassing. The distributors of religious literature, possibly of all informatory publications, become today privileged to carry on their occupations without contributing their share to the support of the government which provides the opportunity for the exercise of their liberties.

Nor do we think it can be said, properly, that these sales of religious books are religious exercises. The opinion of the Court in the *Jeannette* cases emphasizes for the first time the argument that the sale of books and pamphlets is in itself a religious practice. The Court says the Witnesses "spread their interpretations of the Bible and their religious beliefs largely through the hand distribution of literature by full or part time workers." "The hand distribution of religious tracts is an age-old form of missionary evangelism—as old as the history of printing presses." "It is more than preaching; it is more than distribution of religious literature. It is a combination of both. Its purpose is as evangelical as the revival meeting. This form of religious activity occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." "Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance." "The judgment in *Jones* v. *Opelika* has this day been vacated. Freed from that controlling precedent, we can restore to their high, constitutional position the liberties of itinerant evangelists who disseminate their religious beliefs and the tenets of their faith through distribution of literature." The record shows that books entitled "Creation" and "Salvation," as well as Bibles, were offered for sale. We shall assume the first two publications, also, are religious books. Certainly there can be no dissent from the statement that

selling religious books is an age-old practice, or that it is evangelism in the sense that the distributors hope the readers will be spiritually benefited. That does not carry us to the conviction, however, that when distribution of religious books is made at a price, the itinerant colporteur is performing a religious rite, is worshipping his Creator in his way. Many sects practice healing the sick as an evidence of their religious faith or maintain orphanages or homes for the aged or teach the young. These are, of course, in a sense, religious practices but hardly such examples of religious rites as are encompassed by the prohibition against the free exercise of religion.

And even if the distribution of religious books was a religious practice protected from regulation by the First Amendment, certainly the affixation of a price for the articles would destroy the sacred character of the transaction. The evangelist becomes also a book agent.

The rites which are protected by the First Amendment are in essence spiritual—prayer, mass, sermons, sacrament—not sales of religious goods. The card furnished each Witness to identify him as an ordained minister does not go so far as to say the sale is a rite. It states only that the Witnesses worship by exhibiting to people "the message of said gospel in printed form, such as the Bible, books, booklets and magazines, and thus afford the people the opportunity of learning of God's gracious provision for them." On the back of the card appears: "You may contribute twenty-five cents to the Lord's work and receive a copy of this beautiful book." The sale of these religious books has, we think, relation to their religious exercises, similar to the "information march," said by the Witnesses to be one of their "ways of worship" and by this Court to be subject to regulation by license in *Cox* v. *New Hampshire,* 312 U. S. 569, 572, 573, 576.

The attempted analogy in the dissenting opinion in *Jones* v. *Opelika,* 316 U. S. 584, 609, 611, which now be-

comes the decision of this Court, between the forbidden burden of a state tax for the privilege of engaging in interstate commerce and a state tax on the privilege of engaging in the distribution of religious literature is wholly irrelevant. A state tax on the privilege of engaging in interstate commerce is held invalid because the regulation of commerce between the states has been delegated to the Federal Government. This grant includes the necessary means to carry the grant into effect and forbids state burdens without Congressional consent.[16] It is not the power to tax interstate commerce which is interdicted, but the exercise of that power by an unauthorized sovereign, the individual state. Although the fostering of commerce was one of the chief purposes for organizing the present Government, that commerce may be burdened with a tax by the United States. Internal Revenue Code, § 3469. Commerce must pay its way. It is not exempt from any type of taxation if imposed by an authorized authority. The Court now holds that the First Amendment wholly exempts the church and press from a privilege tax, presumably by the national as well as the state government.

The limitations of the Constitution are not maxims of social wisdom but definite controls on the legislative process. We are dealing with power, not its abuse. This late withdrawal of the power of taxation over the distribution activities of those covered by the First Amendment fixes what seems to us an unfortunate principle of tax exemption, capable of indefinite extension. We had thought that such an exemption required a clear and certain grant. This we do not find in the language of the First and Fourteenth Amendments. We are therefore of the opinion the judgments below should be affirmed.

---

[16] *Brown* v. *Maryland*, 12 Wheat. 419, 445, 448; *Kentucky Whip & Collar Co.* v. *Illinois Central R. Co.*, 299 U. S. 334, 350; *Gwin, White & Prince, Inc.* v. *Henneford*, 305 U. S. 434, 438; *Puget Sound Co.* v. *Tax Commission*, 302 U. S. 90.

Mr. Justice Roberts, Mr. Justice Frankfurter, and Mr. Justice Jackson join in this dissent. Mr. Justice Jackson has stated additional reasons for dissent in his concurrence in *Douglas* v. *Jeannette, post,* p. 166.

Mr. Justice Frankfurter, dissenting:

While I wholly agree with the views expressed by Mr. Justice Reed, the controversy is of such a nature as to lead me to add a few words.

A tax can be a means for raising revenue, or a device for regulating conduct, or both. Challenge to the constitutional validity of a tax measure requires that it be analyzed and judged in all its aspects. We must therefore distinguish between the questions that are before us in these cases and those that are not. It is altogether incorrect to say that the question here is whether a state can limit the free exercise of religion by imposing burdensome taxes. As the opinion of my Brother Reed demonstrates, we have not here the question whether the taxes imposed in these cases are in practical operation an unjustifiable curtailment upon the petitioners' undoubted right to communicate their views to others. No claim is made that the effect of these taxes, either separately or cumulatively, has been, or is likely to be, to restrict the petitioners' religious propaganda activities in any degree. Counsel expressly disclaim any such contention. They insist on absolute immunity from any kind of monetary exaction for their occupation. Their claim is that no tax, no matter how trifling, can constitutionally be laid upon the activity of distributing religious literature, regardless of the actual effect of the tax upon such activity. That is the only ground upon which these ordinances have been attacked; that is the only question raised in or decided by the state courts; and that is the only question presented to us. No complaint is made against the size of the taxes. If an appropriate claim, indicating that the taxes were oppressive in their effect upon the petition-

ers' activities, had been made, the issues here would be very different. No such claim has been made, and it would be gratuitous to consider its merits.

Nor have we occasion to consider whether these measures are invalid on the ground that they unjustly or unreasonably discriminate against the petitioners. Counsel do not claim, as indeed they could not, that these ordinances were intended to or have been applied to discriminate against religious groups generally or Jehovah's Witnesses particularly. No claim is made that the effect of the taxes is to hinder or restrict the activities of Jehovah's Witnesses while other religious groups, perhaps older or more prosperous, can carry on theirs. This question, too, is not before us.

It cannot be said that the petitioners are constitutionally exempt from taxation merely because they may be engaged in religious activities or because such activities may constitute an exercise of a constitutional right. It will hardly be contended, for example, that a tax upon the income of a clergyman would violate the Bill of Rights, even though the tax is ultimately borne by the members of his church. A clergyman, no less than a judge, is a citizen. And not only in time of war would neither willingly enjoy immunity from the obligations of citizenship. It is only fair that he also who preaches the word of God should share in the costs of the benefits provided by government to him as well as to the other members of the community. And so, no one would suggest that a clergyman who uses an automobile or the telephone in connection with his work thereby gains a constitutional exemption from taxes levied upon the use of automobiles or upon telephone calls. Equally alien is it to our constitutional system to suggest that the Constitution of the United States exempts church-held lands from state taxation. Plainly, a tax measure is not invalid under the federal Constitution merely because it falls upon persons engaged in activities of a religious nature.

Nor can a tax be invalidated merely because it falls upon activities which constitute an exercise of a constitutional right. The First Amendment of course protects the right to publish a newspaper or a magazine or a book. But the crucial question is—how much protection does the Amendment give, and against what is the right protected? It is certainly true that the protection afforded the freedom of the press by the First Amendment does not include exemption from all taxation. A tax upon newspaper publishing is not invalid simply because it falls upon the exercise of a constitutional right. Such a tax might be invalid if it invidiously singled out newspaper publishing for bearing the burdens of taxation or imposed upon them in such ways as to encroach on the essential scope of a free press. If the Court could justifiably hold that the tax measures in these cases were vulnerable on that ground, I would unreservedly agree. But the Court has not done so, and indeed could not.

The vice of the ordinances before us, the Court holds, is that they impose a special kind of tax, a "flat license tax, the payment of which is a condition of the exercise of these constitutional privileges [to engage in religious activities]." But the fact that an occupation tax is a "flat" tax certainly is not enough to condemn it. A legislature undoubtedly can tax all those who engage in an activity upon an equal basis. The Constitution certainly does not require that differentiations must be made among taxpayers upon the basis of the size of their incomes or the scope of their activities. Occupation taxes normally are flat taxes, and the Court surely does not mean to hold that a tax is bad merely because all taxpayers pursuing the very same activities and thereby demanding the same governmental services are treated alike. Nor, as I have indicated, can a tax be invalidated because the exercise of a constitutional privilege is conditioned upon its payment. It depends upon the nature of the condition that

is imposed, its justification, and the extent to which it hinders or restricts the exercise of the privilege.

As I read the Court's opinion, it does not hold that the taxes in the cases before us in fact do hinder or restrict the petitioners in exercising their constitutional rights. It holds that "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment." This assumes that because the taxing power exerted in *Magnano Co.* v. *Hamilton*, 292 U. S. 40, the well-known oleomargarine tax case, may have had the effect of "controlling" or "suppressing" the enjoyment of a privilege and still was sustained by this Court, and because all exertions of the taxing power may have that effect, if perchance a particular exercise of the taxing power does have that effect, it would have to be sustained under our ruling in the *Magnano* case.

The power to tax, like all powers of government, legislative, executive and judicial alike, can be abused or perverted. The power to tax is the power to destroy only in the sense that those who have power can misuse it. Mr. Justice Holmes disposed of this smooth phrase as a constitutional basis for invalidating taxes when he wrote "The power to tax is not the power to destroy while this Court sits." *Panhandle Oil Co.* v. *Knox*, 277 U. S. 218, 223. The fact that a power can be perverted does not mean that every exercise of the power is a perversion of the power. Thus, if a tax indirectly suppresses or controls the enjoyment of a constitutional privilege which a legislature cannot directly suppress or control, of course it is bad. But it is irrelevant that a tax can suppress or control if it does not. The Court holds that "Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of resources necessary for its maintenance." But this is not the same as saying that "Those who do tax the exercise of this religious practice have made its exercise so costly as to deprive it of the resources necessary for its maintenance."

The Court could not plausibly make such an assertion because the petitioners themselves disavow any claim that the taxes imposed in these cases impair their ability to exercise their constitutional rights. We cannot invalidate the tax measures before us simply because there may be others, not now before us, which are oppressive in their effect. The Court's opinion does not deny that the ordinances involved in these cases have in no way disabled the petitioners to engage in their religious activities. It holds only that "Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse." I quite agree with this statement as an abstract proposition. Those who possess the power to tax might wield it in tyrannical fashion. It does not follow, however, that every exercise of the power is an act of tyranny, or that government should be impotent because it might become tyrannical. The question before us now is whether these ordinances have deprived the petitioners of their constitutional rights, not whether some other ordinances not now before us might be enacted which might deprive them of such rights. To deny constitutional power to secular authority merely because of the possibility of its abuse is as valid as to deny the basis of spiritual authority because those in whom it is temporarily vested may misuse it.

The petitioners say they are immune as much from a flat occupation tax as from a licensing fee purporting explicitly to cover only the costs of regulation. They rightly reject any distinction between this occupation tax and such a licensing fee. There is no constitutional difference between a so-called regulatory fee and an imposition for purposes of revenue. The state exacts revenue to maintain the costs of government as an entirety. For certain purposes and at certain times a legislature may earmark exactions to cover the costs of specific governmental services. In most instances the revenues of the state are tapped from multitudinous sources for a

common fund out of which the costs of government are paid. As a matter of public finance, it is often impossible to determine with nicety the governmental expenditures attributable to particular activities. But, in any event, whether government collects revenue for the costs of its services through an earmarked fund, or whether an approximation of the cost of regulation goes into the general revenues of government out of which all expenses are borne, is a matter of legislative discretion and not of constitutional distinction. Just so long as an occupation tax is not used as a cover for discrimination against a constitutionally protected right or as an unjustifiable burden upon it, from the point of view of the Constitution of the United States it can make no difference whether such a money exaction for governmental benefits is labeled a regulatory fee or a revenue measure.

It is strenuously urged that the Constitution denies a city the right to control the expression of men's minds and the right of men to win others to their views. But the Court is not divided on this proposition. No one disputes it. All members of the Court are equally familiar with the history that led to the adoption of the Bill of Rights and are equally zealous to enforce the constitutional protection of the free play of the human spirit. Escape from the real issue before us cannot be found in such generalities. The real issue here is not whether a city may charge for the dissemination of ideas but whether the states have power to require those who need additional facilities to help bear the cost of furnishing such facilities. Street hawkers make demands upon municipalities that involve the expenditure of dollars and cents, whether they hawk printed matter or other things. As the facts in these cases show, the cost of maintaining the peace, the additional demands upon governmental facilities for assuring security, involve outlays which have to be met. To say that the Constitution forbids the states to obtain the necessary revenue from the whole of a class that enjoys these benefits

and facilities, when in fact no discrimination is suggested as between purveyors of printed matter and purveyors of other things, and the exaction is not claimed to be actually burdensome, is to say that the Constitution requires not that the dissemination of ideas in the interest of religion shall be free but that it shall be subsidized by the state. Such a claim offends the most important of all aspects of religious freedom in this country, namely, that of the separation of church and state.

The ultimate question in determining the constitutionality of a tax measure is—has the state given something for which it can ask a return? There can be no doubt that these petitioners, like all who use the streets, have received the benefits of government. Peace is maintained, traffic is regulated, health is safeguarded—these are only some of the many incidents of municipal administration. To secure them costs money, and a state's source of money is its taxing power. There is nothing in the Constitution which exempts persons engaged in religious activities from sharing equally in the costs of benefits to all, including themselves, provided by government.

I cannot say, therefore, that in these cases the community has demanded a return for that which it did not give. Nor am I called upon to say that the state has demanded unjustifiably more than the value of what it gave, nor that its demand in fact cramps activities pursued to promote religious beliefs. No such claim was made at the bar, and there is no evidence in the records to substantiate any such claim if it had been made. Under these circumstances, therefore, I am of opinion that the ordinances in these cases must stand.

Mr. Justice Jackson joins in this dissent.