**CAROLINA ACTION, Plaintiff,**

v.

**T. E. PICKARD, Jr., John G. Pritchard, James A. Todd, Individually and as members of the Charity Solicitation Commission of the City of Charlotte, N. C., and the City of Charlotte, North Carolina, Defendants.**

No. C–C–76–236.

United States District Court, W. D. North Carolina, Charlotte Division.

Feb. 12, 1979.

Louis L. Lesesne, Jr., Chambers, Stein, Ferguson & Becton, Charlotte, N. C., for plaintiff.

W. A. Watts, Deputy City Atty., Charlotte, N. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

McMILLAN, District Judge.

On August 23, 1976, plaintiff Carolina Action, a community action organization, filed this suit seeking to restrain enforcement of an ordinance of the City of Charlotte which prevented plaintiff from engaging in a house-to-house fund raising and organizing campaign in the city. On September 20, 1976, the court held an evidentiary hearing on plaintiff's motion for preliminary relief and two days later entered a preliminary injunction restraining defendants from enforcing that portion of the local solicitation ordinance which absolutely prohibits solicitation by groups whose solicitation expenses might constitute more than 25% of the anticipated revenue from the solicitation campaign. *Carolina Action v. Pickard*, 420 F.Supp. 310 (W.D.N.C.1976).

All parties have been allowed the opportunity to supplement the record and submit proposed findings of fact and conclusions of law. The court has reviewed those submissions as well as the evidence and exhibits produced by the parties and makes the following

## FINDINGS OF FACT

*Parties*

1. Plaintiff Carolina Action was at the time of the filing of the complaint an unincorporated, nonprofit association headquartered in Durham, North Carolina. It was at all relevant times licensed by the North

Carolina Department of Human Resources under Chapter 143B, Article 3, Part 6, and Chapter 108, Article 3, Part 1, of the North Carolina General Statutes, to solicit funds in North Carolina (Plaintiff's Exhibit 6). After the suit was filed, plaintiff became incorporated under Chapter 55A of the North Carolina General Statutes (Defendants' Exhibit I, at 2). The pleadings are hereby amended accordingly to conform to the evidence.

2. The individual defendants T. E. Pickard, Jr., John G. Pritchard, and James A. Todd were at the time of filing citizens of the City of Charlotte and members of the Charity Solicitations Commission of the City of Charlotte established pursuant to Charlotte Code § 2–25 (Verified Complaint and Answer, ¶ 3, Plaintiff's Exhibit 5). The court is informed and believes that the individual defendants are no longer members of the Commission, having been replaced by present members Theodore G. Law, Jr., Jack R. Miller, and Sheila Harris. As plaintiff seeks only injunctive relief against the individual defendants in their official capacity, the new members of the Commission are hereby substituted as parties defendant. *See* Federal Rules of Civil Procedure rule 25(d)(1).

3. Defendant City of Charlotte is a municipal corporation existing under the laws of the State of North Carolina, and has the capacity, under N.C.G.S. § 160A–11, to be sued (Verified Complaint and Answer ¶ 4).

4. This action for injunctive relief was brought by plaintiff to remedy an alleged infringement by defendants of plaintiff's first amendment rights of speech and association by defendants' enforcement of certain provisions of the Charlotte Code.

*The Regulatory Scheme*

5. Under N.C.G.S. § 160A–178, cities are empowered to regulate the "solicitation of contributions from the public for any charitable or eleemosynary purpose." Ordinances adopted pursuant to this empowering legislation are expressly permitted to include requirements that

". . . an application be made and a permit issued, that an investigation be made, that activities be reasonably limited as to time and place, that proper credentials and proof of financial stability be submitted, that not more than a stated percentage of contributions to solicitation campaigns be retained for administrative expenses, and that an adequate bond be posted to protect the public from fraud." (N.C.G.S. § 160A–178; Defendants' Exhibit B.) In addition, Chapter 903 of the 1963 North Carolina Session Laws specifically empowers the governing body of the City of Charlotte to regulate by ordinance all public solicitations for any "charitable, benevolent, health, educational, religious, patriotic or other similar cause" (Defendants' Exhibit A).

6. To regulate solicitation activities, the City of Charlotte enacted Charlotte Code §§ 2–24 to 2–34, reprinted in the appendix *infra* (Plaintiff's Exhibit 5). The ordinance establishes the Charity Solicitations Commission and sets out procedures to be followed in applying for permits to solicit and in evaluating applications for permits; it applies to all solicitations for "charitable, patriotic, educational or philanthropic purposes" so long as the solicitation is not directed solely to the membership of the soliciting organization.

7. The terms "charitable," "patriotic," "educational," and "philanthropic" are nowhere defined in the ordinance. They have been interpreted by defendants not to include "political" organizations under whose auspices individuals campaign for elective office, nor some related, "auxiliary political organizations," for example, "Young Republicans" and "Young Democrats" organizations. Organizations which do not support candidates for office and are not closely associated with an organization that does so, are not considered "political" and thus are not exempt from the ordinance (Plaintiff's Exhibit 9, ¶ 7; Plaintiff's Exhibit 12, at 28–29).

8. Plaintiff does not support any individual candidates for public office and therefore does not fall within the definition

of a "political organization" as defendants have defined the term. Rather, Carolina Action is considered to be a "charitable" organization and therefore subject to the solicitation ordinance (Plaintiff's Exhibit 12, at 30–32).

9. Carolina Action is a community action organization engaged primarily in assisting low and moderate income families to gain a meaningful voice in local and state affairs (Plaintiff's Exhibit 7, at 2; Plaintiff's Exhibit 12, at 5–6). Plaintiff has in the past directed its efforts toward issues such as utility rate reform, prescription price posting, and neighborhood improvements such as street paving, lighting, recreation facilities and increased safety (Plaintiff's Exhibit 12, at 6; Plaintiff's Exhibit 1, at 4). Its activities have included lobbying for and organizing evening hearings before the State Utilities Commission to provide day workers the opportunity to appear before the Commission and express their views on pending utility rate issues, and drafting and submitting to the state legislature proposed legislation in areas of concern to plaintiff's members.

### The Application Process

10. Plaintiff sought to conduct in Charlotte a house-to-house solicitation and canvass and therefore applied to the Commission for a permit. As required by the ordinance (§ 2–28), plaintiff on June 22, 1976, filed a written application (Complaint and Answer ¶ 8; Plaintiff's Exhibit 1).

11. The Carolina Action campaign was to combine four interrelated but identifiable activities of the organization. Each canvasser was responsible for 1) explaining the operation of Carolina Action and describing its past efforts and achievements; 2) discussing with residents their interest in actively participating in Carolina Action's organizing efforts in regard to local issues of interest; 3) having the resident sign a petition, carried by the canvasser, relating to a local issue of interest; and 4) requesting a contribution from the resident (Plaintiff's Exhibit 1, Schedule B). Based on these responsibilities, 50% of each canvass-

er's time and salary was attributed by plaintiff to fund raising and 50% to "program" (*Id.*).

12. Plaintiff was denied a permit by the Commission on the ground that the application disclosed that the cost of the fund raising effort would exceed the 25% of receipts mandatory ceiling set out in § 2–30 of the ordinance. By letter dated July 9, 1976, plaintiff was informed of the denial and its right under the ordinance to a hearing before the Commission (Defendants' Exhibit C).

13. On July 21, 1976, the Commission conducted a hearing to review the denial. Plaintiff was represented at the hearing by Peter Wood, Director of Solicitation. At the conclusion of the hearing, the Commission ruled again that plaintiff should be denied a permit to solicit because of its failure to satisfy the 25% requirement of § 2–30 (Plaintiff's Exhibit 7).

### Overbreadth

Plaintiff attacks the ordinance, specifically § 2–30, on the ground that the mandatory 25% limitation is an overly broad restriction on the exercise of first amendment rights because it prohibits the use of protected modes of expression and association even when, as here, no legitimate interest of the community is served by its enforcement. In evaluating plaintiff's challenge, the court is required to consider the nature of plaintiff's interest, the nature and permissible scope of the community's regulatory interest, and the extent to which the challenged ordinance serves to further the community interest without unduly interfering with plaintiff's interest.

14. Plaintiff is not affiliated with any out of state organizations. It gets its funds from membership fees, foundation grants, and solicitations. Membership fees are $10 per year. In return for the membership fee, members receive the organization's newspaper, bumper stickers and buttons (Plaintiff's Exhibit 7, at 2, 4). Plaintiff's receipts from foundation grants are minimal. From February 1975 to February 1977, only seven contributions in excess of

$100 were received by plaintiff, all from foundations (Plaintiff's Response to Defendants' First Interrogatories). The balance of plaintiff's funds come from its organization/solicitation efforts such as the one proposed to the Commission in June 1976.

15. The informational and solicitation aspects of the house-to-house canvass of Carolina Action are interdependent. It utilizes the canvass method to bring new members into its organization, as well as to gain support for itself as an organization and for its stances on particular issues. Conversely, the canvass would not be possible without a concurrent solicitation for contributions. Carolina Action depends heavily upon the results of its solicitation drives to support its activities; 60% of its operating budget comes from such campaigns (Plaintiff's Exhibit 12, at 6–7, 20).

16. Defendants' examination of the application submitted by plaintiff, as well as the hearing conducted to review defendants' initial denial of a permit, uncovered no indication that plaintiff had engaged in or would engage in any fraud, deceit, or misuse of funds (Plaintiff's Exhibit 12, at 26–27, 32–33). All the information available to defendants demonstrated, rather, that plaintiff was a bona fide civic action organization (Plaintiff's Exhibit 7, at 7–8; see also Defendants' Exhibit I, at 2–4).

17. All of plaintiff's canvassers are equipped with sufficient information to answer, and are instructed to answer upon request, any inquiry regarding the breakdown of plaintiff's income and expenses, including income received during the course of its solicitation drive (Plaintiff's Exhibit 12, at 8–9).

18. The Charlotte solicitation ordinances were enacted to protect residents from fraud and misrepresentations by those purporting to solicit funds for the use of bona fide organizations, as well as by those who might use the opportunities afforded to one purporting to solicit funds for a worthy cause to engage in or facilitate the commission of crimes (Plaintiff's Exhibit 9, at ¶ 5).

19. The regulatory scheme provides no relief from the 25% cost limitation. Disappointed applicants are entitled to a hearing to contest the denial of and demonstrate their qualification for, a permit from the Commission, but if they fail to meet the 25% cut-off the permit is denied, irrespective of any showing regarding the organization or its management (See Plaintiff's Exhibit 12, at 32; Plaintiff's Exhibit 7).

*Vagueness*

Plaintiff also challenges the ordinance under the Fourteenth Amendment as unconstitutionally vague and violative of due process in wording and administration. This means, in the vernacular, that the court must determine whether " 'men of [ordinary] intelligence must necessarily guess at its meaning.' " *Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (quoting *Connally v. General Construction Co.*, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926)).

20. Section 2–28 of the solicitation ordinance provides that any prospective soliciting organization must complete an application containing several items of information, including the estimated cost of the solicitation and a breakdown of any wages, fees, commissions, and the like to be paid in connection with the solicitation (§ 2–28(h), (k)).

21. Since January 1974, seven organizations have been allowed by defendants to file applications for solicitation permits without providing specific information about the costs of solicitation. In some instances the items were left blank because, it *later* appeared, there were in fact no costs. In regard to other applicants, defendants granted permits, notwithstanding the filing of incomplete cost-of-solicitation information and the existence of such costs, on the ground that the Commission *later* determined that those costs would be within the 25% limit (Plaintiff's Exhibit 11, ¶ 2).

22. Section 2–30 provides that upon receipt of an application in compliance with § 2–28, the Commission "shall make such investigation as it sees fit" to determine

whether the applicant meets the substantive requirements of the section and qualifies for a permit.

23. Investigations are conducted, if at all, by Ms. Ruth Armstrong, the City Clerk. An investigation is not conducted in every case. When an application appears to the Commission to be complete and accurate, and "where it shows on its face that a permit should be issued under the ordinance," then no investigation is conducted (Plaintiff's Exhibit 9, ¶ 2).

24. Section 2–30, in defining the scope of items to be included in the 25% cost-of-solicitation calculation, states that the Commission must include "the cost of raising the funds and all expenses incident to the solicitation (including all fees and commissions to be paid to the promoter or promoters of the same)."

25. In applying the 25% limitation, the Commission has approved applications by others for solicitation permits notwithstanding that applicants' reported costs reasonably characterizable as being "incident to the solicitation" amounted to more than 25% of "the total amount to be raised." For example, defendants approved an application by Carolinas Carousel, Inc., in which the applicant disclosed that, out of an anticipated revenue of $2,500–$3,000, it would pay 25% commissions to various participating organizations and also spend $1,205 for buttons.

The Commission has also approved applications by the Charlotte Sertoma Club and Scout Troop 33 which disclosed that the cost of items to be "sold" as part of the solicitation might nearly equal the revenue anticipated from the solicitation.

26. Most strikingly, defendants refused to attribute any portion of plaintiff's canvassers' salaries to items not included in the 25% calculation, despite the undisputed evidence that the canvassers' duties included organizational and informational functions, as well as solicitation.

27. The 25% limitation is computed with respect to the applicant's *proposed* revenues from the solicitation (Plaintiff's Exhibit 1, ¶ 8). The applicant is free to select an appropriate figure and the Commission is free, in its discretion, to believe or disbelieve it.

28. Under § 2–30, the Commission must also find that the funds solicited will be placed in the hands of "responsible and reliable persons." These terms are not defined; the record suggests, however, that they have been interpreted as justifying a probing inquiry into both the applicant organization and the individuals who are responsible for it (*See generally* Plaintiff's Exhibit 7, at 2, 4–7).

Based on the foregoing findings of fact and a review of the record as a whole, the court makes the following

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter under 28 U.S.C. § 1343(3), in that the plaintiff is challenging an infringement of rights protected by the First and Fourteenth Amendments to the United States Constitution, under color of state law, by virtue of a city ordinance and the enforcement thereof. 42 U.S.C. § 1983.

2. The court has jurisdiction over the individual defendants, in their representative capacity as agents of the City of Charlotte, charged with direct enforcement and administration of the ordinance. Further, the court has jurisdiction over the City of Charlotte as a "person" as used in 42 U.S.C. § 1983. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3. Plaintiff's combined informational, organizational, and solicitation efforts constitute the exercise of First Amendment rights of free speech. *See, e. g., Murdock v. Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). Plaintiff's activity, designed to assist citizens in having an effective voice on local issues before the agencies of government responsible for determining the outcome on those issues, has consistently been held by the United States Supreme Court to deserve at least as much protection from in-

terference by the state as those speech activities defendants characterize as "political" and therefore outside the scope of the Charlotte ordinance entirely. For example, in *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966), the Court declared:

> "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect *the free discussion of governmental affairs*. This of course *includes* discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and *all such matters relating to political processes.*"

*Id.* at 218–19, 86 S.Ct. at 1437 (emphasis added), *quoted with approval in Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 47 L.Ed.2d 727 (1976). To hold that plaintiff has no First Amendment protection from state interference because it chooses to, or must, combine its solicitation and non-solicitation activities would violate the mandate of *Murdock, supra*, that "freedom of speech, freedom of the press, freedom of religion [be] available to all, not merely to those who can pay their own way." 319 U.S. at 111, 63 S.Ct. at 874.

■ 4. The City of Charlotte has a valid regulatory interest in protecting its citizens from fraudulent solicitations and insuring the safety, comfort and convenience of its citizens. Within narrow limits, it is entitled, in furtherance of those interests, to screen prospective solicitors for limited purposes. Those purposes are to establish identity, to insure that solicitors will act for the organizations they purport to represent, and to regulate, within reason, the time, place, and manner of solicitation. *See e. g., Murdock*, supra at 116–17, 63 S.Ct. 870; *Cantwell v. Connecticut*, 310 U.S. 296, 306–07, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *accord, Hynes, supra* 425 U.S. at 616–17, 96 S.Ct. 1755.

■ 5. The mandatory imposition of the 25% cost-of-solicitation rule set out in § 2–30 is overly broad. It stultifies protected speech, as it makes the ability to engage in neighborhood canvassing-solicitation dependent on a showing that plaintiff's representatives and ideas will be sufficiently popular to obtain at least $3 in contributions above every $1 expended in the canvass. Such a requirement is likely to operate most seriously to the detriment of those organizations espousing unusual or unpopular views and therefore most urgently in need of protection from encroachments on their First Amendment rights. It is the unpopular or unusual organizations whose survival may depend on being able to conduct the type of integrated campaign utilized by plaintiff. The imposition of a 25% cost-of-solicitation limitation, without providing relief for organizations that can demonstrate their bona fides and good reason for being relieved of the percentage limitation, ultimately and unlawfully serves, as it might have here, to make the right to engage in neighborhood canvassing depend on the content of the canvassers' message rather than on the legitimate interest of the community in the character of the canvassers. *See Hynes, supra* at 617, 96 S.Ct. 1755; *accord, Citizens for a Better Environment v. Schaumburg*, 590 F.2d 220 (7th Cir. 1978).

6. The 25% cost-of-solicitation limitation is also unconstitutionally vague in that:

(a) Defendants' administration of the application process renders it uncertain when and of whom compliance with the provision will be required;

(b) Defendants' failure to include in the 25% calculation the cost of items sold to the public on the ground that such items are "capital assets," not "expenses," proceeds from an accounting classification not founded in the broad language of § 2–30, which requires the inclusion of the "cost of raising the funds" (*cf.* § 2–24(a));

(c) Defendants' refusal to attribute any of plaintiff's canvassers' salaries to non-solicitation functions on the ground that plaintiff's solicitation, organizational, and informational activities occur at the same time, is not compelled by § 2–30

in the face of undisputed evidence that these activities are combined because of plaintiff's precarious financial position. Under defendants' interpretation of the language of § 2–30, the "cost of raising the funds" grows in direct proportion to the need of the applicant to integrate its public contact activities; the more efficient it attempts to be, the more likely it will be denied a permit under the presumed authority of § 2–30.

7. In addition, § 2–30 requires that the Commission find that those handling the proceeds are "responsible and reliable persons." The Commission's authority under § 2–30 to conduct "such investigation as it sees fit" to make this finding provides authority for an inquiry of undetermined scope and depth, and the opportunity for conscious or unconscious harassment and censorship. *See Schneider, supra* at 163–64, 60 S.Ct. 146.

8. Lastly, the very coverage of the ordinance is unclear. The Commission has excepted as "political" all organizations which support candidates for public office, yet has included apparently as "charitable" or "educational," organizations whose purpose is to influence the *conduct*, rather that the *staffing*, of political institutions. The terms of the ordinance do not suggest such a fine distinction.

9. The ambiguities in wording, and the inevitably inconsistent administration of the ordinance, unlawfully require every applicant, not just "men of ordinary intelligence, [to] necessarily guess at its meaning," and place in the hands of the commission "the *effective* power to grant or deny permission to canvass." *Hynes, supra* 425 U.S. at 620, 622, 96 S.Ct. at 1760, 1761 (emphasis in original); *cf. U. S. Labor Party v. Pomerleau*, 557 F.2d 410 (4th Cir. 1977).

*Scope of Relief*

10. The overbreadth and vagueness of § 2–30 necessitate that defendants be enjoined from further enforcement of that section.

11. A review of the remaining sections of the solicitation ordinance, particularly the § 2–27 ban against soliciting without a permit and the § 2–28 requirement that prospective solicitors fill out an extensive application, demonstrates that these sections cannot reasonably be construed to maintain a constitutional regulatory framework in the absence of § 2–30, and therefore must also be the subject of injunctive relief. *See United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *Hayward v. Clay*, 573 F.2d 187 (4th Cir. 1978). Without the guidelines, however ill defined, of § 2–30, these other two sections would operate together to provide sufficient information and authority to allow the municipality to exercise complete control over the content of speech of neighborhood canvassers, including a blanket prohibition.

Based on the foregoing findings of fact and conclusions of law, IT IS ORDERED:

1. Charlotte Code § 2–30 is declared to be an unconstitutionally vague and overbroad infringement on plaintiff's First and Fourteenth Amendment rights of free speech and to due process.

2. Defendants are permanently enjoined and restrained from enforcing Charlotte Code §§ 2–27, 2–28, and 2–30.

3. Plaintiff is entitled to reasonable attorneys' fees, 42 U.S.C. § 1988. An appropriate order will issue.

APPENDIX

EXHIBIT A

DIVISION 2. CHARITY SOLICITATIONS COMMISSION *

Sec. 2–24. Definitions.

(a) The words "solicit" and "solicitation" shall mean the request directly or indirectly of money, credit, property, financial assistance or other thing of value on the plea or

---

* Cross references—Churches, religious and fraternal organizations exempt from license tax, § 11–11; soliciting alms for charitable purposes, § 13–39.

representation that such money, credit, property, financial assistance or other thing of value will be used for a charitable, patriotic, educational or philanthropic purpose, in any office or business building, by house to house canvass or in any other public or private place by telephone, personal interview, mail, or otherwise. The said words shall also mean and include the sale or offer to sell any article, tag, ticket, emblem, publication, advertisement, subscription or other thing, whether of value or not, on the plea or representation that such money, credit, property, financial assistance or other thing of value will be used for a charitable, patriotic, educational or philanthropic purpose.

(b) The word "promoter" shall mean any person who promotes, manages, supervises, organizes or attempts to promote, manage, supervise or organize a campaign of solicitation.

(c) The word "permit" shall mean a certificate signed by the city clerk issued to any person showing that he has complied with the provisions of this division.

(d) The word "commission" shall mean the charity solicitations commission hereinafter provided for. (Code 1946, Ch. 15, § 1)

Sec. 2–25. Created; appointment of members; terms of office; meetings, quorum and regulations.

There is hereby created for the administration of this division a charity solicitations commission, which shall be composed of three (3) members appointed by the mayor, all of whom shall be citizens of Charlotte, one of whom shall be designated by the mayor as chairman and another as vice chairman. The mayor shall appoint the members of this commission for terms of three (3) years each to succeed in regular order the members whose terms originally expired on May 31, 1942, May 31, 1943, and May 31, 1944. When a vacancy occurs the mayor shall appoint a citizen of the city to serve for the unexpired term of the member whose position has become vacant. The mayor shall not appoint any person who is the organizer or local head of any charitable, patriotic, educational or philanthropic agency. The commission shall determine its time and place of meeting and shall, except as herein otherwise provided, adopt such regulations as in its judgment will effectuate the purpose and intent of this division. A majority of the members shall constitute a quorum for the transaction of business. The members of the commission shall serve without compensation. No member of the commission shall serve more than two (2) full consecutive terms.

Any member who fails to attend at least seventy-five per cent (75%) of the regular and special meetings held by the commission during any one year period shall be automatically removed from said commission. Vacancies resulting from a member's failure to attend the required number of meetings shall be filled as provided herein. (Code 1946, Ch. 15, § 3; Ord. No. 590, § 1, 9–11–72; Ord. No. 124, § 1, 4–8–74)

Sec. 2–26. Exemptions from provisions, designated.

The following solicitations shall be exempt from the provisions of this division: Solicitations by an organization, society, association, league or corporation that is organized and operated exclusively for religious, educational, philanthropic, benevolent, fraternal, or charitable purposes and is not operated for the pecuniary profit of its members of shareholders where the solicitation is by members addressed to members and is without remuneration on the part of solicitors; also solicitations in the form of collections or contributions sought at the regular exercises or services of any organization, society, association, league or corporation. (Code 1946, Ch. 15, § 2)

Sec. 2–27. Permits—Required.

No person shall solicit within the city without a permit that is in full force and effect, nor shall any person act within the city as promoter of the solicitation campaign of any person who does not have such a permit. (Code 1946, Ch. 15, § 4)

Sec. 2–28. Same—Procedure to obtain.

Any person desiring to obtain a permit shall sign and swear to an application addressed to the commission, which shall be filed with the city clerk and shall contain the following information:

(a) Name of person or organization applying for a permit to solicit and the address of its headquarters.

(b) Names and addresses of its principal officers and all promoters connected or to be connected with the proposed solicitations.

(c) The purpose for which such solicitation is to be made and the use or disposition to be made of any receipts therefrom.

(d) The name of the person by whom the receipts of such solicitation shall be disbursed.

(e) The names and addresses of the person who will be in direct charge of conducting the solicitation.

(f) An outline of the method or methods to be used in conducting the solicitations.

(g) The time when such solicitations shall be made, giving the proposed dates for the beginning and ending of such solicitations.

(h) The amount of any wages, fees, commissions, expenses or emoluments to be expended or paid to anyone in connection with such solicitation, together with the manner in which such wages, fees, commissions, expenses or emoluments are to be expended, to whom paid and the amount thereof.

(i) A financial statement for the last preceding fiscal year of any funds collected for the purposes named in the application by the organization or persons seeking the permit; said statement to give the amount of money raised, together with the cost of raising it and the details of the distribution thereof.

(j) A full statement of the character and extent of the charitable, educational, or philanthropic work being done by the applicant within the city.

(k) A statement of the estimated cost of conducting the proposed campaign of solicitation.

(l) A statement to the effect that if a permit is granted, it will not be used or represented in any way as an endorsement by the commission, the city, the governing body of the city, or by any employee thereof.

(m) Such other information as may be required by the commission in order to enable it to determine the kind and character of the proposed solicitation. (Code 1946, Ch. 15, § 5)

Sec. 2–29. Same—Filing false application.

It shall be a violation of this division for any person knowingly to file, or cause to be filed, an application containing one or more false statements. (Code 1946, Ch. 15, § 6)

Sec. 2–30. Same—Investigation of applicants; issuance; procedure when permit refused; extensions.

When an application for a permit is filed, the commission shall make such investigation as it sees fit and if it finds that the proposed solicitation is to be for a bona fide charitable, patriotic, educational or philanthropic purpose, that the organization for which the solicitation is to be conducted is, and the disbursement of the funds raised by the solicitation will be, under the control and supervision of responsible and reliable persons, and that the cost of raising the funds and all expenses incident to the solicitation (including all fees and commissions paid or to be paid to the promoter or promoters of the same) will not exceed twenty-five per cent (25%) of the total amount to be raised, then, and in that event, the commission shall authorize the city clerk to issue to the applicant a permit to solicit for the purpose named in the application, but, failing to so find, the commission shall reject the application.

If the commission rejects an application, written notice to that effect shall be given the applicant with an opportunity to appear before the commission and to present such evidence in support of his application as may be relevant.

If the commission authorizes the issuance of a permit it shall determine the period for which the permit shall run not to exceed ninety days from its date, provided that upon a further application the commission may, after such investigation as it sees fit, determine that it is in the public interest to extend the term of a permit, in which event an extension of the permit may be authorized up to but not exceeding ninety additional days.

The city clerk shall issue such permits and extensions as the commission shall authorize. (Code Supp. 1954, Ch. 15, § 7)

Sec. 2–31. Same—Fees.

At the time when a permit is issued, there shall be paid to the city treasurer the sum of two dollars ($2.00) as a permit fee, and the sum of two cents ($0.02) for each facsimile copy of the permit that is desired up to and including one hundred (100) copies, and one cent ($0.01) for each copy desired in excess of one hundred (100). (Code 1946, Ch. 15, § 8)

Sec. 2–32. Same—Nontransferable; copies furnished.

Any permit approved and issued under this division shall be nontransferable, provided, however, that this shall not prevent any permittee from using any number of solicitors and representatives as shall be reported to the city clerk and, provided further, that the permittee shall furnish to each of its agents, employees or representatives making any solicitations a facsimile copy of the permit which shall be carried by all such agents, employees or representatives making solicitations at the time or times when solicitations are being made. (Code 1946, Ch. 15, § 9)

Sec. 2–33. Same—Revocation; procedure.

If, upon the receipt of written information or upon its own investigation, the commission shall find that any officer, agent or representative of a permittee is misrepresenting facts or making untrue statements, or has misrepresented facts or made untrue statements, with regard to solicitations or the purposes thereof, or has made any un-

true statements in the application, or that in any other way the solicitation has been conducted or is being conducted, in violation of any part of this division and not in conformity with the intent and purpose of this division, then the commission shall notify the city clerk, who shall immediately revoke and cancel such permit; provided, however, that before any permit is revoked, the city clerk shall mail to the permit holder a notice that a hearing is to be had before the commission, and such notice shall be mailed at least twenty-four (24) hours before the hearing, and at said hearing the commission shall ascertain the facts, and if any reason or reasons above set forth for revoking the permit are found to exist, the permit shall be revoked. (Code 1946, Ch. 15, § 11)

Sec. 2–34. Representation of endorsement by city prohibited.

It shall be unlawful for any permittee or for any agent, employee or representative thereof to advertise, represent or hold out in any manner that said permit is an endorsement of the holder thereof by the governing body of the city or any employee thereof, or by the city; provided that it shall be lawful for a permittee to use, advertise or hold out the fact of its permit in the following words and no others: "Charities Solicitations Permit No._____," including in the blank space the serial number of the permit. (Code 1946, Ch. 15, § 10)