[906 NYS2d 709]

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v THOMAS LARSEN, Defendant.

THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, v EDWARD WARDLE, Defendant.

Criminal Court of the City of New York, New York County, July 30, 2010

APPEARANCES OF COUNSEL

*Joel Berger*, for Thomas Larsen, defendant. *Cyrus R. Vance, Jr., District Attorney* (*Michael Ford* of counsel), for plaintiff. *Legal Aid Society* (*Steven Banks* and *Todd Albert* of counsel), for Edward Wardle, defendant. *Cyrus R. Vance, Jr., District Attorney* (*Michael Ford* of counsel), for plaintiff.

**OPINION OF THE COURT**

MICHAEL GERSTEIN, J.

We are asked to determine whether topical novelty condoms should be deemed expressive items similar to other First Amendment protected items for purposes of exempting vendors of those items from New York City's general vendor licensing statute, Administrative Code of the City of New York § 20-453. Our decision requires analysis of First Amendment jurisprudence, as well as analysis of the statute upon which the charge is based and the items sold by defendants.

Defendants[1] are each charged with violating section 20-453, for allegedly displaying and offering for sale condoms on the street without a general vendor license. Defendants move to dismiss the complaints for facial insufficiency pursuant to CPL 170.30, arguing that their activity falls within the First Amendment exceptions to the licensing requirement. Specifically, defendant Larsen argues that the novelty condoms fall within the "written matter" exception specified in Administrative Code § 20-453. Defendant Wardle, relying on a 2005 New York City Department of Consumer Affairs letter that lists vendors of "items bearing political messages" as exempt from the licensing statute, argues that the sale of items is protected by the First Amendment.[2] The People oppose the motion.

## Underlying Facts

It is undisputed that the police observed Larsen at the intersection of Broadway and Canal Street and Wardle at the intersection of Broadway and West 47th Street displaying and offering for sale "Obama Condoms" and "Palin Condoms."[3] At the time of observation, neither defendant was displaying a license issued by the NYC Department of Consumer Affairs, nor

---

**1.** Because defendants' motions address similar issues, these cases have been consolidated on consent for this decision only.

**2.** Wardle's motion to dismiss was filed as part of an omnibus motion. The other branches of Wardle's motion are addressed in a separate decision.

**3.** Copies of each condom wrapper are annexed to Larsen's moving papers.

could they produce one when asked. One of the "Obama Condoms" wrappers bears an image of President Barack Obama in front of the White House with the banner heading, "HOPE IS NOT A FORM OF PROTECTION." This message is explained on the reverse side of the wrapper as "a call to action" for the Obama Administration "that hope is not enough and responsibility is needed." The message is also meant as "a call to sexual responsibility; you can't just pull out and 'Hope.' " Another Obama condom is titled "THE ULTIMATE STIMULUS PACKAGE" and "is meant to call attention to the severity of our economic state" and "to get people laid, not laid off." The "Palin Condoms" bear an image of Sarah Palin in front of mountainous terrain suggestive of Alaska with the banner heading, "WHEN ABORTION IS NOT AN OPTION," footnoted "As Thin As Her Resume." On the reverse side of the wrapper, it states that this message "takes aim at both [Sarah Palin] and the Republican Party's stance on a woman's right to choose. If a woman should not be granted the right to choose . . . then condoms become of the utmost importance." The wrappers bear the insignia of Practice Safe Policy (PSP) and provide a link to its Web site, www.practicesafepolicy.com.

We take judicial notice that, according to a June 9, 2008 press release, PSP is the "nation's first brand devoted to showcasing the indecent relations between politics and sex." Through its "intimate yet topical novelty products," PSP wants to turn people's attention from "minor concerns like war, the economy, or health care and instead focus on the truly important issue of the day: practicing safe policy in the bedroom." (http://www.practicesafepolicy.com/about.) PSP is a division of Vertú Group LLC, a New York limited liability company. (*See* Limited Liability Company Law.)

Given these messages, defendants argue that their merchandise falls within the First Amendment exceptions to Administrative Code § 20-453, and thus the case should be dismissed.

## Legal Background

### A. The First Amendment

As an "essential [mechanism for] democracy," the First Amendment "protect[s] all forms of peaceful expression in all of its myriad manifestations." (*Bery v City of New York*, 97 F3d 689, 694 [2d Cir 1996], citing *Abood v Detroit Bd. of Ed.*, 431 US 209 [1977].) It extends protection not only to written or spoken words, but also to "pictures, films, paintings, drawings,

and engravings" (*Kaplan v California*, 413 US 115, 119 [1973]), and numerous other avenues of expression. (*See Bery*, 97 F3d at 694.)

First Amendment protection is not diminished by the fact that speech "is sold rather than given away." (*City of Lakewood v Plain Dealer Publishing Co.*, 486 US 750, 756 n 5 [1988].) As a result, courts have struck down laws enacted to control or suppress speech at different points in the speech process: restrictions requiring a permit at the outset (*Watchtower Bible & Tract Soc. of N. Y., Inc. v Village of Stratton*, 536 US 150 [2002]); imposing a burden by impounding proceeds on receipts or royalties (*Simon & Schuster, Inc. v Members of N. Y. State Crime Victims Bd.*, 502 US 105 [1991]); seeking to exact a cost after the speech occurs (*New York Times Co. v Sullivan*, 376 US 254 [1964]); and subjecting the speaker to criminal penalties (*Brandenburg v Ohio*, 395 US 444 [1969]; *Citizens United v Federal Elec. Commn.*, 558 US —, 130 S Ct 876 [2010]).

B. The Evolution of the Commercial Speech Doctrine

In *Chaplinsky v New Hampshire* (315 US 568, 571-572 [1942]), the Supreme Court recognized certain "well-defined and narrowly limited classes of speech" that have never been thought to raise any constitutional problem. These classes of speech are: the lewd and obscene, the profane, the libelous, and insulting or "fighting" words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace. (*Id.* at 572.)[4] Such words, the Court concluded, "are no essential part of any exposition of ideas." (*Id.*)

Just a month after *Chaplinsky*, the Supreme Court indicated that commercial speech fell into one of the limited classes of restricted speech. In *Valentine v Chrestensen* (316 US 52 [1942]), the Supreme Court addressed efforts by the City of New York to regulate advertising. In that case, Chrestensen purchased a former Navy submarine, printed handbills advertising that visitors could, for a fee, "[s]ee how men live in a Hell Diver" (122 F2d 511, 512 [2d Cir 1941]), and sought permission to dock his submarine at a city-owned dock at Battery Park. New York City denied Chrestensen permission to dock at the city dock, and police informed him that section 318 of New York City's Sanitary Code prohibited distribution of any commercial

---

4. The character of every act depends upon the circumstances in which it is done. (*Schenck v United States*, 249 US 47, 52 [1919].) The First Amendment does not protect one who falsely shouts "fire" in a crowded theater, thereby causing panic. (*Id.*)

handbill or other advertising matter in any public place, *except* leaflets making public protests. (316 US at 53.) After obtaining permission to dock at a state-owned pier in the East River, Chrestensen then printed new handbills, the front advertising the "Hell Diver" at its new location, and the back protesting the City's refusal to permit him to dock at the city dock. (*Id.*)

The Second Circuit, by a divided court, affirmed the lower court's decision enjoining enforcement of the regulation against Chrestensen, noting the need to distinguish between profit-making and non-profit-making activities. (*Chrestensen v Valentine*, 122 F2d 511, 516 [1941].) Nevertheless, in terms of regulating expression in public places on circulars and handbills, the Second Circuit held that there should be no difference between "group protest for abstract religious or political principle [and] individual protests for concrete business injuries." (*Id.*) The dissent, finding no relationship between the two sides of the handbill other than that Chrestensen determined to put them on a single sheet of paper, noted that free speech protection "should not be extended to commercial advertisements simply because the word 'speech,' taken alone, includes both social and business discourse." (*Id.* at 525.)[5]

However, when Chrestensen's suit reached the Supreme Court, the Court easily disposed of his First Amendment argument, stating: "We are . . . clear that the Constitution imposes no . . . restraint on government as respects purely commercial advertising," and thus reversed the Second Circuit and vacated the injunction against the City. (*Valentine*, 316 US at 54, 55 ["If (Chrestensen) was attempting to use the streets of New York by distributing commercial advertising, the prohibition of the code provision was lawfully invoked against his conduct"].)

Three decades later, the Supreme Court directly addressed the issue of commercial speech. In a case challenging a Virginia statute that prohibited the advertising of drug prices, the Court moved away from *Valentine*, concluding that "speech which does 'no more than propose a commercial transaction' " is not "so removed from any 'exposition of ideas' " that it lacks all protection. (*Virginia Bd. of Pharmacy v Virginia Citizens Consumer Council, Inc.*, 425 US 748, 762 [1976].) The Court held drug price advertising is protected because:

---

5. The dissent, citing Oliver Wendell Holmes, noted the difficulty in drawing the line between noncommercial and commercial speech (122 F2d at 520), but also noted that "Thomas Paine, John Milton and Thomas Jefferson were not fighting for the right to peddle commercial advertising." (*Id.* at 524.)

"[s]o long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable." (*Id.* at 765.)

Despite the expansive language, *Virginia Bd.* granted only minimal protection to commercial speech, noting that "a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired." (*Virginia Bd.*, 425 US at 772 n 24.)

A few years later, the Supreme Court addressed a New York State regulation prohibiting electric utilities from running advertisements promoting the use of electricity. In *Central Hudson Gas & Elec. Corp. v Public Serv. Comm'n of N. Y.* (447 US 557 [1980]), the Court established the four-part test still used today. As a threshold issue, the Court held commercial speech receives First Amendment protection if it is truthful and concerns lawful activity. (*See id.* at 566.) Commercial speech clearing this threshold may be restricted only if: (a) the governmental interest in regulation is substantial; (b) the restriction directly advances the government's asserted interest; and (c) the restriction is no more extensive than necessary to serve that interest. (*Id.*) Applying this test, the Supreme Court overturned New York's ban on utility advertising.

In *Board of Trustees of State Univ. of N. Y. v Fox* (492 US 469 [1989]), a corporation and students brought action seeking declaratory and injunctive relief against the Board of Trustees of the New York State university system (SUNY) based upon the refusal of the university and its officials to permit the corporation to conduct product demonstrations, which the Court likened to Tupperware parties, in campus dormitory rooms. In a decision written by Justice Scalia, the Court held that speech involved in product demonstrations in campus dormitory rooms was "commercial speech," for purposes of First Amendment analysis, even though the seller also touched upon other subjects such as being financially responsible and running an efficient home. The *Fox* Court substantially relaxed the fourth prong of the *Central Hudson* test, holding that governmental restrictions upon commercial speech need not be the absolute least restrictive means to achieve the desired end; rather, restrictions require only a reasonable fit between government's ends and

the means chosen to accomplish those ends. "What our decisions require is a ' "fit" between the legislature's ends and the means chosen to accomplish those ends'—a fit that is not necessarily perfect, but reasonable." (*Fox*, 492 US at 480 [citation omitted].)[6]

## C. Speech Protection and the Sale of Merchandise

It is well established that the sale of merchandise can constitute fully protected activity under the First Amendment. The Ninth Circuit addressed the question in *Gaudiya Vaishnava Socy. v City & County of San Francisco* (952 F2d 1059, 1060 [9th Cir 1990]), where the plaintiffs, five nonprofit organizations, were engaged in charitable, religious and political activities in San Francisco, including performing sankirtan, a public religious ritual, and otherwise promoting their respective views and causes, while selling message-bearing T-shirts, bumper stickers and buttons. The Court held that when nonprofits engage in activities where pure speech and commercial speech are inextricably intertwined, the entirety must be classified as fully protected noncommercial speech. (*Id.* at 1066.)

Since *Gaudiya*, the Ninth Circuit has consistently held that the sale of merchandise inextricably intertwined with a religious, political, ideological or philosophical message is fully protected by the First Amendment (*Hunt v City of Los Angeles*, 601 F Supp 2d 1158 [CD Cal 2009]), and subsequently held that protection under *Gaudiya* did not depend on the nonprofit status of the seller (*Perry v Los Angeles Police Dept.*, 121 F3d 1365 [9th Cir 1997]).

However, in *White v City of Sparks* (500 F3d 953, 955 [9th Cir 2007]), the Ninth Circuit took a new approach, establishing that as a threshold matter the court must determine whether the merchandise is "inherently expressive," a determination that appears to rest in significant part on its medium.[7] If so, *White* held, it is likely protected. If not, a court should then ask whether the sale of the merchandise is inextricably intertwined with pure speech, in which case the sale is therefore protected. (*Id.*)

---

**6.** In dissent, Justice Blackmun, joined by Justices Brennan and Marshall, argued that even under the majority decision, "it is highly doubtful that the university could prohibit students from inviting to their rooms a representative from a birth-control clinic, from whom the students seek information about services the clinic provides for a fee." (*Id.* at 488 n 3.)

**7.** A painting, so long as it is an artist's self-expression, is inherently expressive because it expresses the artist's perspective and thus will be protected under the First Amendment. (*White* at 956.)

The Ninth Circuit in *White* followed a similar approach taken by the Second Circuit in *Mastrovincenzo v City of New York* (435 F3d 78 [2006]). In that case, the Second Circuit held that "[o]nce a court has determined that an item possesses expressive elements, it should then consider whether that item also has a common non-expressive purpose." (*Id.* at 95.) If so, the court must determine whether the nonexpressive purpose is dominant, looking at such factors as the price, the seller's stated motivation, and "whether a vendor . . . purports, through the sale of goods, to be engaging in an act of self-expression rather than a mere commercial transaction." (*Id.* at 97.)

D. New York City Administrative Code § 20-453

Against this backdrop, we turn to the statute at issue, New York City Administrative Code § 20-453:

> "It shall be unlawful for any individual to act as a general vendor without having first obtained a license in accordance with the provisions of this subchapter, *except that it shall be lawful for a general vendor who hawks, peddles, sells or offers to sell, at retail, only newspapers, periodicals, books, pamphlets or other similar written matter*, but no other items required to be licensed by any other provision of this code, to vend such without obtaining a license therefor." (Emphasis added.)

New York City's General Vendors Law serve the purpose of keeping the public streets free of congestion and maintaining the "tax base and economic viability of the City." (435 F3d at 99.) For a time, however, the vending law treated all vendors the same[8]—that is, anyone seeking to sell items on the street was required to obtain a vendor's license—and was consequently criticized for its potentially chilling effect on protected speech. (*See generally* Local Law No. 33 [1982] of City of NY; Hearing of the New York City Council Committee on Consumer Affairs on the Subject of Intro 1080 [1981], statement of Arthur N. Eisenberg, Staff Counsel, New York Civil Liberties Union.) In 1982, in an effort to bring the law in line with the "principles of free speech," the New York City Council amended the law to include the language italicized above, exempting from the licensing requirement vendors of newspapers, books and other similar written matter. (*Bery*, 97 F3d at 692.) The amendment's legislative history demonstrates "that the City Council's intent

---

8. Section 20-453 was formerly known as section B32-491.0 of the Administrative Code (enacted in 1977).

was to permit only vendors of a narrowly defined category of written matter to sell their materials without complying with the legal requirements for a license." (*People v Shapiro*, 139 Misc 2d 344, 346 [Crim Ct, NY County 1988].)

More than a decade after the statutory amendment, two groups of visual artists sought injunctive relief in federal court against the enforcement of Administrative Code § 20-453 as applied to the sale of artwork. In the seminal opinion at the interplay of the statute with the First Amendment, the Second Circuit recognized that determining what constitutes expression within the ambit of the First Amendment and what does not will surely "prove difficult at times, but that difficulty does not warrant placing all visual expression in limbo outside the reach of the First Amendment's protective arm." (*Bery*, 97 F3d at 696.) The Second Circuit ultimately expanded upon the statutory exception to include objects like "paintings, photographs, prints and sculptures" that are of such expressive content that they "always communicate some idea or concept to those who view it." (*Id.*) Thus, the common thread running through the statutory exceptions to the vendor licensing requirement, and the various non-written-matter exceptions as recognized by the *Bery* court, is communication "that contributes to or generates the exchange of ideas that . . . are fundamental to a democratic society." (*Shapiro*, 139 Misc 2d at 346-347.)

## Legal Analysis

### A. Written Matter Exception

Defendants' sale of condoms in message-bearing wrappers falls into a "gray area left by the jurisprudence as it attempts to balance the First Amendment's fundamental purpose" with the task of also making meaningful distinctions between "expression and non-expression, and commercial speech and fully protected speech" (*Hunt*, 601 F Supp 2d at 1179), and requires this court to engage in the "difficult task" as posited by the Second Circuit in *Bery* (97 F3d at 696 n 6), with only "faint consolation." (*Mastrovincenzo*, 435 F3d at 85.)

The merchandise at issue is neither a book, pamphlet, newspaper nor periodical. Nor is it a painting, photograph, print or sculpture as is understood by the *Bery* court. If anything, it is, as the defendants argue, "other similar written matter," based on the expressive writing included on the condom wrappers. However, this general written matter language does not encompass all printed material, otherwise it would render the

exception meaningless. (*Shapiro*, 139 Misc 2d at 348.) It does account for the various forms written matter can take, which inevitably leads to difficult line-drawing. (*E.g. Bery v City of New York*, 97 F3d at 696 [City considers baseball cards written material, but not calendars and street maps]; *People v Gillings*, 149 Misc 2d 950 [Crim Ct, NY County 1991] [record album liner notes are covered by the statutory exception, while records without accompanying writings are not exempted]; *but see Johnson v Fleming*, 1996 WL 502410, *3, 1996 US Dist LEXIS 12860, *8 [SD NY 1996] [album covers and lyric sheet inserts are not "written matter"].)

As support for the contention that the merchandise is written material, defendants cite *People v Saul* (3 Misc 3d 260 [Crim Ct, NY County 2004]). In *Saul*, the court held that the sale of playing cards bearing "the photographic images of military and political figures associated with the war in Iraq," but containing no written language supporting or opposing the war, did not constitute expression as understood by the exception in section 20-453, and thus could be subject to the vendor licensing requirement. (*Id*. at 261.) The court found that the cards did not communicate "ideas, opinions, emotions or a point of view." (*Id*. at 265.) The court further noted that the few words on each playing card do not "make it the equivalent of a book," rather they merely serve "to identify [a] picture." (*Id*.) By contrast, defendants' products do more than bear images of and identify political figures; they communicate messages arguably designed "to stimulate political awareness and conversation." Thus, defendants argue, this type of message is more like the political message protected in *People v Krebs* (54 Misc 2d 578 [Crim Ct, NY County 1967]).

Krebs was charged with peddling without a license for selling buttons bearing an anti-Vietnam War message. (*Id*.) The court determined that the buttons were "part and parcel of the dissemination of [the defendant]'s convictions," based on the fact that she was also distributing literature and persuading people about her views on the Vietnam War. (*Id*. at 580.) The court dismissed the case, stating that the peddler license ordinance "was not intended to . . . subject proper exercise of free speech" to regulation. (*Id*.)

*Krebs* is factually distinguishable from our case. The distinction here between pure speech, which lies at the heart of the written matter exception, and commercial speech is not so clear. In *Krebs*, the court considered the sale of political buttons fully

protected speech as a result of the defendant also distributing literature and advocating her views on the Vietnam War. Similarly, the Ninth Circuit exempted nonprofit organizations from an ordinance prohibiting the sale of merchandise other than books, pamphlets, buttons, bumper stickers, posters, or "items that have no intrinsic value other than to communicate a message" because the sale of message-bearing T-shirts and clothing was done in conjunction with "inform[ing] individuals of their causes through distributing their literature [and] engaging in persuasive speech." (*Gaudiya*, 952 F2d at 1061, 1064.) And, in *Murdock v Pennsylvania* (319 US 105, 112 [1943]), the Supreme Court held that Jehovah's Witness' door-to-door selling activities were "merely incidental and collateral" to their main object of preaching, and therefore protected by the First Amendment. The sale of merchandise in these cases was intertwined with "informative and perhaps persuasive speech" seeking support for particular causes. (*Village of Schaumburg v Citizens for a Better Environment*, 444 US 620, 632 [1980].)

Here, although obscured by the company's somewhat clunky name, Practice Safe Policy,[9] defendants seem "primarily concerned with providing information about the characteristics and costs of goods and services," and are thus engaged in commercial speech. (*Id.* at 632.) Defendants do not contend to be engaging in "informative" and "persuasive" speech—like distributing literature or attempting to inform passersby of their views on safe sex—other than to sell what PSP deems "novelty products." The fact that the clever marketing of these products is tied to current events does not, by itself, entitle them to full constitutional protection. (*Fox*, 492 US at 475 [commercial advertising which links a product to a current debate is not thereby entitled to the constitutional protection afforded noncommercial speech].) Thus, the "speech" here is calculated to attract attention to a commercial enterprise, in essence, a sales pitch, similar to that given in *Fox*.

As further support that defendants are engaging in commercial speech, we again take judicial notice of the full extent of PSP's activities. According to its Web site, PSP is offering a new line of products which do little to "stimulate" the type of "political" conversation they are allegedly aiming for: "ObamaCondoms.com" T-shirts with "No Experience Necessary" printed on the back side. There is no reference to practicing safe sex or to

---

9. As noted above, PSP is a division of Vertú Group LLC, a New York limited liability company.

supporting or opposing political views, or any views at all other than to make sales. PSP is also now advertising Oil Spill Condoms, "Drill Without the Spill." (amNew York, July 20, 2010, at 7.) Such activity seems more clearly focused on marketing a brand rather than engaging in fully protected speech.

In addition, this case is distinguishable from *Krebs* because of the nonexpressive purpose or utility of the merchandise. Indeed, the nonexpressive utility of the condoms is also what distinguishes this case from the protected items listed in a January 21, 2005 NYC Department of Consumer Affairs letter cited by defendant Wardle. The letter lists items that can be displayed or sold without a general vendor license; in addition to newspapers, pamphlets, and periodicals that are enumerated in Administrative Code § 20-453, the letter lists "items bearing political messages (e.g., buttons, T-shirts, flags)."

Unlike condoms, buttons—along with bumper stickers, flags, picket signs, and yard signs—are of little value, both expressive *and* nonexpressive, without a political message or symbol affixed. Similarly, a T-shirt serves a blank canvas on which to affix a political message, with the ultimate purpose being just as much to convey that message to others as to clothe the wearer. The same cannot be said of a condom. As the Second Circuit informs us, "where an object has a dominant non-expressive purpose it will be classified as a 'mere commercial good[ ],' " the sale of which likely falls outside the scope of the First Amendment. (*Mastrovincenzo*, 435 F3d at 95.) This is not to say that items with a common nonexpressive purpose or utility and bearing a political message cannot fall within the First Amendment-protected items, but not under the circumstances of this case, where proposing a commercial transaction appears to be the primary motivation and the political references are used as a marketing device to boost sales.

To the extent that *Saul* suggests that the written matter exception is satisfied when the written material has substance or does more than merely identify an image, our analysis is somewhat different. (*Saul*, 3 Misc 3d at 265.)[10] Symbolism or messaging can be attached to nearly any product. We do not believe that a gun upon which is embossed "The Right of the

---

**10.** Indeed, the written material on a Trojan condom package provides just as much if not more substance than the written material on an Obama condom. The text on a Trojan condom package informs the potential purchaser: "Helps Reduce the Risk of Pregnancy and Sexually Transmitted Diseases." (http://www.trojancondoms.com.)

People to Keep and Bear Arms" can fall within the written matter exception because the message is written and political. (*See Nordyke v King*, 319 F3d 1185, 1190 [9th Cir 2003] [a gun conveying "The Right of the People to Keep and Bear Arms" message likely represents a form of political expression]; *see also Hunt v City of Los Angeles*, 601 F Supp 2d 1158, 1179 n 18 [2009] [suggesting that attaching a message to tires—such as "I think technology drives our society"—and doing nothing more to communicate that message through the sale of the tire than to state it simultaneously cannot be characterized a fully protected speech].) Such an expansive reading of Administrative Code § 20-453 would frustrate its purpose.

Finally, "[c]ommon sense . . . is what is needed in order to explore the actual meaning of legislative enactments." (*Mt. Graham Red Squirrel v Madigan*, 954 F2d 1441, 1453 [9th Cir 1992].) While the "other similar written matter" language in Administrative Code § 20-453 can encompass a variety of forms, under the circumstances of this case, common sense dictates that topical novelty products, notwithstanding their expressive packaging, are not inherently similar to books, newspapers and pamphlets. To hold otherwise would render the written matter exception meaningless. We therefore find that merchandise at issue in this case does not fall within what has come to be understood as the First Amendment exceptions to section 20-453.

B. First Amendment Rights

Our inquiry is not at an end. It is necessary to determine whether application of section 20-453 to the defendants is a valid "time, place or manner" restriction. In *Mastrovincenzo*, the Second Circuit held that section 20-453 is a content-neutral regulation since it "serves purposes unrelated to the content of [the regulated] expression," namely: (1) keeping the public streets free of congestion for the convenience and safety of its citizens; (2) maintaining the "tax base and economic viability of the City"; and (3) preventing the sale of "stolen, defective or counterfeit merchandise." (*Mastrovincenzo*, 435 F3d at 99 [City may enforce Administrative Code § 20-453 against street vendors of clothing painted with graffiti].) As such, the restrictions in the statute must be reasonable, narrowly tailored to serve a significant government interest, and leave open ample alternative channels for communication. (435 F3d at 98.)

Here, Administrative Code § 20-453 is narrowly tailored in that it does not target particular messages while favoring oth-

ers. (435 F3d at 99.) Nor does it confer "unbridled discretion on the licensing authority" enabling that authority "to favor some speakers while suppressing others." (*Id.*) Further, New York City's stated objectives in enforcing its licensing requirement constitute "significant governmental interests." (*Id.* at 100.)

The statute provides for "ample alternative channels" of communication (*id.*). Defendants, should they so desire, may personally distribute these products to the public free of charge without running afoul of the statute, which requires a vendor license only for those selling or offering to sell merchandise on the streets. (*Id.* at 101.) Should they be unable to obtain a vendor license, they may sell their products through stores or on the Internet. (*Id.* at 102.) At most, therefore, Administrative Code § 20-453 prohibits unlicensed vendors "from *personally* selling their wares *for a profit* and *at a venue of their choosing.*" (435 F3d at 101.)

We therefore find that Administrative Code § 20-453, as applied, is a valid "time, place, or manner" restriction that, while perhaps not the least speech-restrictive means available, is narrowly tailored and leaves the defendants with ample alternative channels of communication.

Our opinion should in no way be deemed to diminish the robust and full First Amendment protection afforded political speech, even when that speech includes a commercial element. If condoms packaged in message-bearing wrappers had been offered for sale by an advocacy organization, such as Planned Parenthood or any nonprofit or religious entity similar to the plaintiffs in *Gaudiya*, we would likely hold that the items set forth the views of the advocacy organization, and are thus subject to full First Amendment protection. But while commercial activity is an essential part of our society (*see Bery, supra*), it is not subject to the same level of First Amendment protection as is political and other advocacy speech. Here, defendants appear to have been engaged in a marketing campaign, the purpose of which was to sell corporate novelty products at a substantial profit,[11] rather than to promote any ideas or viewpoints. And, while the Supreme Court has recently expanded the right of business corporations to engage in advocacy speech without restriction in support of or opposition to political candidates, we find nothing in the Supreme Court's

---

11. It appears that the price at which the condoms at issue were offered for sale was considerably in excess of that for similar products lacking the "novelty" verbiage of the wrappers.

most recent opinion that would render a vendor licensing statute unconstitutional, either facially or as applied to defendants. (*See Citizens United, supra.*)

We review the complaints at issue only for facial insufficiency on a sparse record. At trial, the evidence may demonstrate that defendants were engaged primarily in advocacy rather than commercial activities.

## Conclusion

For the reasons discussed above, defendants' motions to dismiss are denied in their entirety.